## DICK v. UNITED STATES.
### No. 48879.

United States Court of Claims.
Feb. 7, 1949.

MADDEN, J., dissenting.

———◆———

W. V. T. Justis, of Washington, D. C. (Hewes & Awalt, of Hartford, Conn., on the brief), for plaintiff.

John F. Ganong, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

JONES, Chief Judge.

Plaintiff sues for the value of two propellers, spare parts and patterns furnished the United States Coast Guard, the value of which he alleges to have been $59,275.

Briefly the petition alleges that during the period involved the Coast Guard was under the jurisdiction of the Navy; that prior to 1944 the Navy and the Coast Guard jointly designed a new type of propeller for use on icebreaking vessels; that on June 30, 1944, the plaintiff agreed to manufacture and furnish to the Navy one shipset of the new propeller equipment including two propellers, spare blades and hubs, the price being $55,096.70, the equipment to be manufactured in accordance with a designated Coast Guard plan. Then on July 21, 1944, by contract, the plaintiff agreed, for the sum of $19,556, to manufacture the bow components of the new propeller equipment. This contract also specified that the equipment should be manufactured in accordance with the specified Coast Guard plan with the exception of certain modifications. These two contracts resulted in a price of $74,753.80 for one complete shipset of the new propeller equipment. About these contracts there is apparently no dispute.

On December 26, 1944, the United States Coast Guard headquarters in Washington, D. C., requested a bid on similar new propeller equipment. The following appeared on the first page of the negotiations:

"Telegraphic bid requested, to be confirmed by mail using this bid form."

The requirements, listed on the third page of the negotiation, were described as follows:

"Item No. Description Quantity Unit Price Total

"1. Propellers, each set consisting of (1) left hand propeller, (1) right hand propeller, (3) spare blades for right hand propeller, (1) spare propeller hub for right hand propeller, (3) spare blades for left hand propeller, and spare propeller hub for left hand propeller.

2 sets

All as indicated on Coast Guard Plan No. 96–CR–4400–4 Alteration O. The above propellers and blades to be complete with additional items as covered by list of materials (quantities for one ship) as indicated on the above mentioned plan. Finish, dimensions and materials shall be in ac-cordance with all requirements of the Coast Guard Plan, 96–CR–4400–4.

2. Propellers, two (2) left hand, complete with (3) spare blades for each of two propellers and all additional items as indicated in list of material on Coast Guard Plan No. 96–CR–4400–5. The dimensions, finish, and materials shall all be as required on Coast Guard Plan 96–CR–4400–5.

2 sets"

This negotiation or request for bid was submitted by the Coast Guard to the plaintiff only. It was not submitted to other contractors. There followed considerable telegraphic correspondence. Each of the telegrams sent by plaintiff contained some reference to the Navy contract. In his first telegram plaintiff stated "We now have a Navy contract * * * for identical propeller blades * * *." The telegrams also discussed a conference to be held with one of the Navy officials. On January 10, 1945, the plaintiff, in the belief that the negotiation called for one shipset of the new propeller equipment, telegraphed the Coast Guard quotations on Item No. 1 for 2 sets for $51,032; item No. 2 $16,911.10. The telegram also stated "This same as Bureau of Ships order less the male and female gauges and patterns."

In submitting this bid plaintiff made a mistake. He thought he was submitting a bid for one set of 2 propellers and a bow propeller, rather than two sets of 2 propellers and a bow propeller each. There followed several telegraphic communications. Then on February 19, 1945, the Coast Guard headquarters in Washington issued a second negotiation, bearing the same identifying symbols. The plaintiff received the revised negotiation on February 21, 1945. The next day, February 22, 1945, the plaintiff, still under the impression that the negotiation called for one shipset of the new propeller equipment, telegraphed the Coast Guard a quoted price of $68,275, which included, in addition to the items in the previous negotiation, a new set of patterns at $4,500. On February 24, 1945, the Coast Guard telegraphed plaintiff that—

"Subject execution formal contract your telegraphic offer of 22 February accepted * * * in amount of 47555 dollars item

one and 16220 dollars item 2 also set of patterns 4500 dollars * * * Proceed with work * * * acknowledge."

On February 27, 1945, the plaintiff acknowledged receipt of the order. On March 8, 1945, the Coast Guard sent plaintiff its purchase order in which plaintiff was named as supplier. On March 15, 1945, plaintiff's assistant manager deposited in the mail for the Coast Guard an acceptance of the purchase order. The following day, March 16, 1945, plaintiff telegraphed the Coast Guard that he had made the mistake of quoting one set instead of two sets, and that the price should be doubled. On March 17, 1945, the Coast Guard sent plaintiff a telegram stating

"Your wire quotation for propellers was confirmed by your formal quotation dated 22 February"
and then added

"request letter explanation of prices described as mistake * * * also detailed cost break-down."

The mailed acceptance apparently did not reach defendant's officials until about March 21, 1945.

The plaintiff then submitted an explanation of his mistake to Lt. Comdr. Robbins, United States Coast Guard, then contracting officer, who was in charge of the negotiations. At a conference it was stated that it was obvious a mistake had been made and Commander Robbins agreed to a purchase price of $127,550 and stated that the Coast Guard would prepare a formal contract covering the requirements of the negotiation in which the purchase price would be set forth in the amount of the revised quotation, $127,550. Plaintiff's representative was informed that it would take some time for the formal contract to be prepared and that in view of the urgency of its need for the propellers, defendant desired plaintiff to proceed with the work on the propellers pending the preparation and issuance of the formal contract. Plaintiff, relying on the agreement with the contracting officer, went ahead with the manufacture of the propellers.

On March 31, 1945, the Coast Guard returned to the plaintiff the purchase order referred to above which bore the acceptance of plaintiff as of March 15, 1945.

The Coast Guard prepared a formal contract in which the purchase price was clearly stated to be $127,550. On April 5, 1945, the Coast Guard, after the contract had been approved by its legal division, sent the original and two copies of the formal contract to plaintiff for execution. Plaintiff received them on April 9, 1945, and on the same day executed and returned them to the Coast Guard. In May 1945 the plaintiff learned that the Procurement Legal Division of the Coast Guard had determined that the Coast Guard could not execute the formal contract unless the Comptroller General of the United States ruled that the alleged contract growing out of the telegraphic communications was subject to reformation. Plaintiff prepared and on July 25, 1945, submitted a petition to the Comptroller General for reformation of the alleged contract. The Comptroller General stated that the case had not been previously presented to that office for consideration and plaintiff's letter afforded no proper basis for action at that time, but that a report was being requested from the Navy. In August 1945 the Navy Department submitted to the Comptroller General a report covering the negotiation between the Coast Guard and the plaintiff. On August 31, 1945, the Comptroller General ruled that there was no legal basis for modifying the price stated in the bid of the contractor. A reconsideration of the ruling was denied January 15, 1946.

In the meantime the plaintiff had proceeded with the manufacture of the two shipsets of propellers and spare parts. Delivery was completed in February 1947. On February 12, 1947, the plaintiff submitted an invoice for the propellers and spare parts in the sum of $127,550. On or about April 15, 1947, plaintiff received from the Coast Guard a check in the amount of $68,275. Plaintiff, in accepting the check, protested the deduction of $59,275 from the total invoiced price and reserved all rights in reference thereto.

In view of the many telegraphic communications, modifications and changes, it is doubtful whether any formal contract

or meeting of the minds really occurred during the process of the negotiations. At any rate, we are unable to determine from the allegations in the petition that such a definite contract was made.

The defendant contends that the bid of February 22, 1945, and the acceptance on February 24, 1945, constituted a contract. However, it will be noted that in plaintiff's telegraphic offer of February 22 he stated:

"We quote 47,555 dollars item one and 16,200 dollars item two plus 4,500 *if you require a new set of patterns, but we propose to use the patterns we now have.* * * * [Italics supplied.] "

The Coast Guard in its reply of February 23 stated at the outset:

"Subject execution formal contract your telegraphic offer 22 February accepted for furnishing propellers blades and hubs."

Apparently both of these messages left something to be determined before the agreement was definitely completed.

Defendant earnestly contends that regardless of all previous correspondence, the purchase orders which were prepared by the Coast Guard on March 8, 1945, and mailed to plaintiff, and which plaintiff received on March 15, 1945, and which he signed and deposited in the mail, constituted an acceptance and completion of the contract which could not be revoked by plaintiff, even though the telegram of revocation was received by the defendant several days before the mailed order of acceptance. Plaintiff, on March 16, the day following the mailing of his acceptance, wired defendant of his error and changed his quotation to double the amount specified in the purchase order.

Under the old authorities the depositing in the mails was final as to both parties. This was on the basis that when a letter was deposited in the mails it was beyond the control of the person mailing it. However, some years ago the Post Office Department changed its regulation and provided that anyone depositing a letter in the mail might reclaim it and might even require the postmaster at the point of sending to wire the postmaster at destination to return the letter and that the Post Office Department would be required to return it to the sender. We quote the following from 17 C.J.S., Contracts, § 52, page 405:

"Post-office regulations as to reclaiming letter.—The rule that acceptance is final when the letter has been posted was modified by United States Post Office Regulations 1913 §§ 552, 553, that the writer or sender may apply for a letter which he has put in the mail, and when it is properly identified the postmaster must return it to him or telegraph to the office of the addressee, whose postmaster must return it to the mailing postmaster if it has not been delivered, to the effect that a letter which has been posted, but which has been returned under such regulations, does not constitute an acceptance."

In the case of Traders' National Bank v. First National Bank, 142 Tenn. 229, 217 S.W. 977, 9 A.L.R. 382, this particular change in the postal regulations is discussed, and the case of First National Bank of Murfreesboro v. First National Bank of Nashville et al., 127 Tenn. 205, 154 S.W. 965, is quoted with approval. The Supreme Court of Tennessee made reference to the decisions which had theretofore held that *the depositing of a letter in the mails was final* and then said [142 Tenn. 229, 217 S. W. 978]:

"These cases, in so far as they deal with similar circumstances, proceed on the theory that a delivery is completed when the subject of delivery is posted in the mail.

"The test of delivery, as noted in our cases, is the power of the grantor of a deed or maker of a note to recall the same. Has he parted with dominion and control over it? If so, there has been a delivery. * *

"Heretofore it has been assumed that when a letter was posted it was beyond the control of the sender, and became the property of the addressee as soon as put in the mail. 13 C.J. 302. We think all the cases relied on by the complainant are based on this supposition.

"If a letter, when posted, can be regarded as beyond the control of the sender, then it may well be concluded that delivery of its contents to the addressee has been perfected.

"By the United States Post Office Regulations (1913) §§ 552, 553, a change has

been made as to rights of the parties. The writer or sender may now apply for a letter, which is put in the mail, and when it is properly identified, the postmaster must return it to him, or telegraph to the office of the addressee, whose postmaster must return it to the post office where mailed, if it has not been delivered."

As authority for the last statement reference is made to Ex parte Cote, L.R. 9 Ch. 27. The English Court of Appeal in Chancery discusses the question in the following language:

"In order to make the property in the bills pass, it is not sufficient to indorse them; they must be delivered to the indorsee, or to the agent of the indorsee. If the indorser delivers them to his own agent, he can recover them; if to the agent of the indorsee, he cannot recover them.

"The question therefore arises: Of which party the post office is the agent. In this country [England], where the sender of a letter cannot get it returned after it has been posted, if the indorsee of a bill authorizes the indorser to send the bill through the post office, the bill as soon as it is posted becomes the property of the indorsee. But according to the regulations of the French post office a person who posts a letter may get it back on complying with certain forms at any time before the letter has left the town where it is posted. I am inclined to think that the effect of that rule is that the post office is the agent of the sender of the letter until it leaves the town, and that the indorsement of the bills contained in it is not complete till the letter is dispatched from the town."

In the Traders' National Bank case, supra, after a check had been mailed, the bank telephoned the addressee bank and asked that the check be returned. The addressee, the Traders National Bank, declined and brought suit to collect the amount of the check. The court denied recovery, and in approving the distinction made in the English case said:

"This authority seems to us well reasoned, and, extending it slightly, it covers the case before us. If delivery is not complete until one had lost control of the subject-matter of the delivery, then it was not completed here, since, under the postal regulations, the defendant bank was entitled to reclaim this letter from the mail before it reached the complainant. We may also, as did the English court, regard the post office as the agent of the sender, and, under our postal regulations, and the facts of this case, until the letter was delivered to the addressee."

See also Miller v. Proctor, 24 Tenn.App. 439, 145 S.W.2d 807, 812.

There are several questions in the instant case including:

(1) whether in view of all the conferences, previous contracts and communications the defendant was charged with knowledge of plaintiff's mistake. It was perhaps an understandable mistake under circumstances similar to the one involved in Edmund J. Rappoli Co. v. United States, 98 Ct.Cl. 499, 517;

(2) whether there was ever a definite contract, in which event plaintiff must rely for recovery on the market or reasonable value of the machinery furnished and accepted;

(3) the circumstances and conditions surrounding the depositing in the mail of the purchase order on March 15, whether it was signed by both parties, and the effect of the delivery of the telegram advising of the mistake several days before the defendant received the purchase order; and

(4) what authority had been delegated to the Coast Guard under the First War Powers Act [1] or the Executive Orders issued pursuant thereto, or otherwise, to negotiate, execute or modify contracts.

None of these questions can be properly determined without proof being taken of the facts in the case. Certainly in the light of all the allegations in the plaintiff's petition it cannot be determined at this time that it is not entitled to recover. The demurrer is overruled. It is so ordered.

HOWELL, WHITAKER, and LITTLETON, Judges, concur.

---

[1] 55 Stat. 839, 50 U.S.C.A.Appendix, § 601 et seq.

MADDEN, Judge (dissenting).

I am unable to agree with the opinion of the court. The case, as I see it, is one where the plaintiff, by reason of an error, made a bid and a contract to manufacture certain equipment for the Government at a price which, but for the error, he would not have named. The Government's contracting officer, authorized to solicit the bid and make a contract, having no knowledge or suspicion of the plaintiff's error, accepted the offer and the contract was closed. Shortly thereafter the plaintiff discovered his error and sought a rescission or reformation of the contract. The contracting officer was convinced that the plaintiff had made the error which he claimed, and was willing to rescind the contract already made, and make in its place a new contract embodying the terms which the plaintiff would have offered if he had not made the error. The question was submitted to the Comptroller General of the United States who decided that the contracting officer did not have the right to rescind the contract already made and make a new one on terms more favorable to the plaintiff. Because of this decision the new contract was not made, and the Government, after the plaintiff's performance, settled with him on the basis of the old one, the plaintiff making protests which, I assume, were adequate to preserve whatever further rights he had.

The foregoing being the facts alleged in the plaintiff's petition as I read it, I think it does not state a cause of action and that it is subject to demurrer. The plaintiff would not agree with some points in the statement. He asserts that no contract was made (1) because the Government's telegraphic acceptance on February 24 of his offer of February 22 contained the words "subject execution of formal contract"; and (2) because the detailed purchase order which the plaintiff signed and mailed to the Government on March 15 had not been received by the Government before it received his telegram sent March 16 which advised the Government of his mistake and said, in effect, that he was not willing to make a contract on the basis of the purchase order.

I think the question whether the Government's words "subject execution of formal contract" amounted to a counter offer rather than an acceptance closing a contract is a question of some difficulty which, however, it is not necessary to answer. If it was a counter offer that offer was, in turn, accepted by the plaintiff when he signed and mailed a copy of the purchase order. That was a "formal contract" of considerable length and containing full details, and it cannot be argued that either party contemplated a still later execution of some other still longer document.

My statement that a contract was made, at least when the plaintiff mailed the signed purchase order is supported by the Restatement of Contracts, Sections 64, 67, and by Williston on Contracts, Rev.Ed. Vol. 1, Section 81, where the author cites authorities from numerous American courts, federal and state, and says, at the end of note 4 to section 81, "The only contrary decision not overruled seems to be McCulloch v. Eagle Ins. Co., 1 Pick., Mass., 278. Whether this case would now be followed in Massachusetts may be doubted (citing cases). In Tennessee some qualification of the general rule has been made, see infra, § 86." The author's Tennessee reference is to Traders' National Bank v. First National Bank, 142 Tenn. 229, 217 S.W. 977, 9 A.L.R. 382, which case is relied on in the opinion of the court in the instant case. In the Tennessee case the party who had mailed the letter actually withdrew it from the mail so that it was never delivered, and the court said that except for that actual withdrawal it would have treated the mailing as a delivery to the addressee. If that distinction were followed it would mean that the person mailing the acceptance had a binding contract from the time of mailing, but that the party to whom he mailed the acceptance would not have one until he received the letter, his rights being subject to the sender's power to withdraw his letter from the mails at any time before it was delivered to the addressee. I think little can be said in justification of such a doctrine.

Some occasion or event must be selected by the law as the one which converts ne-

gotiation into contract. The law has, in fact, selected the overt act of delivering an acceptance to the post as that occasion. I think it is a mistake for the court to introduce confusion into a satisfactorily settled legal situation. The court's decision would mean, quite certainly, that a contractor who had mailed his acceptance of an offer made to him by the Government would still be subject to losing his contract if the Government should, before it receives his letter of acceptance, telephone or telegraph him withdrawing the offer. That has not been the law and I think it should not be.

I think, then, that there was a binding contract, so far as the mechanics of the exchange of communications was concerned. The mere exchange of such communications would not, in equity, make a contract, if there was an equitable reason why it should not. The plaintiff urges that ambiguity in the Government's writings induced the plaintiff's mistake, and hence it would be inequitable for the Government to insist upon its contract. The plaintiff says he was bidding only upon one set of equipment. But the person who actually wrote the acceptance for him knew perfectly well that the bid was for two sets, because that person expressly divided the total bid sum in half, and set the half down as the unit price bid and the total, with a slight miscalculation, as twice the amount of the unit price. There was no other possible basis for the division in half of the bid except the recognition that there were to be two sets. I speak of this not to contradict the plaintiff's allegation that an error was made, but to show that the Government's writings were plain to at least some of the people in the plaintiff's staff, and hence were not ambiguous enough to be regarded, in equity, as an inducing cause to what was, otherwise, a unilateral error on the plaintiff's part.

If, as I have said, a contract was made, I think it was never validly rescinded, or replaced by another contract. Whether the broad contracting powers given to some departments by the First War Powers Act and Executive Order No. 9001, 50 U.S.C.A. Appendix, § 611 note, would have permitted the Navy Department to excuse the plaintiff from his contract and award him another and more liberal one, we need not decide, since these things were not authorized by the Department to be done. I suppose it would not be urged that, except for the extraordinary legislation referred to above, one who has auhority to make a contract for the Government has, merely by the fact of his having made the contract, the authority to surrender the Government's rights under that contract by excusing its performance. Whatever authority there might be to do such an unusual and potentially harmful act must be derived from legislation and from authorization by higher executive authority. There is no allegation of any such authority having been conferred upon the contracting officer. His sending to the plaintiff on April 5 of copies of a new formal contract containing the higher price, for signing by the plaintiff and return to him did not create a new contract replacing the old, though it showed quite conclusively the contracting officer's intention to do so if he would be permitted by his superiors.

The plaintiff urges that the Government's contracting officer, here an officer of the Coast Guard, had constructive notice of the price which the plaintiff had charged the Navy for similar equipment, since some of the plaintiff's messages to him said, after quoting bid prices, that they were the same as those charged the Navy on a contract being currently performed. I think that, the prices quoted by the plaintiff being apparently reasonable, there was no duty on the Coast Guard officer to obtain and examine the Navy contract. I can think of only two reasons which might have impelled him to do so: (1) that he thought the plaintiff was not telling the truth when he said that his quoted prices were not higher than those charged the Navy and (2) that he thought the plaintiff might, by mistake, be quoting prices less than those charged the Navy. I think either of these assumptions would have been quite irrational, and that there was no reason why he ought to have known or even suspected that the plaintiff's prices were quoted in error. There is, therefore, no foundation for constructive notice.

We have, then, a case of hardship brought about by the plaintiff's error. I think we should apply to it the usual rules of law and equity with regard to the making and performance of contracts, the rules which we would apply to the Government if the error had been made by it; the rules which a court of general jurisdiction would apply as between private litigants, the Government not being in the case. Under these rules, as I understand them, a contract is not a subjective thing, some unknown or unmanifested inner intention of one of the parties. It is an objective thing, made up of the manifestations outwardly made by the parties, to be seen and acted upon the assumption that, in making contracts, one means what he says, when there is no reason to suppose that he does not. In this way the world's business gets itself done, an occasional hardship is suffered, but persons who have made contracts know what they have, and can expect that their contracts, as made, will be performed. I suppose that in any commercial community, scores of contracts are made every year which one of the parties to them regrets, because he was mistaken as to some circumstance relating to it. This case seems to me to be only a somewhat striking example of that kind of unilateral mistake. The law, in its long experience, has not thought it wise to undo such contracts, and I cannot say that the law is wrong.