155 So.2d 889 (1963)
Charles W. MORRISON and Yvonne Morrison, his wife, Appellants,
v.
A.H. THOELKE and Mattie Thoelke, his wife, Appellees.
No. 3743.
District Court of Appeal of Florida. Second District.
August 30, 1963.
*890 Arthur G. Leonhardt, Jr., of Whitfield, Wright & Leonhardt, Orlando, for appellants.
Charles E. Hoequist of Edwards & Hoequist, Orlando, for appellees.
ALLEN, Acting Chief Judge.
Appellants, defendants and counter-plaintiffs in the lower court, appeal a summary final decree for appellees, plaintiffs and counter-defendants below. The plaintiff-appellees, owners of certain realty, sued to quiet title, specifically requesting that defendant-appellants be enjoined from making any claim under a recorded contract for the sale of the subject realty. Defendant-appellants counterclaimed, seeking specific performance of the same contract and conveyance of the subject property to them. The lower court, after hearing, entered a summary decree for plaintiffs.
A number of undisputed facts were established by the pleadings, including the facts that appellees are the owners of the subject property, located in Orange County; that on November 26, 1957, appellants, as purchasers, executed a contract for the sale and purchase of the subject property and mailed the contract to appellees who were in Texas; and that on November 27, 1957, appellees executed the contract and placed it in the mails addressed to appellants' attorney in Florida. It is also undisputed that after mailing said contract, but prior to its receipt in Florida, appellees called appellants' attorney and cancelled and repudiated the execution and contract. Nonetheless, appellants, upon receipt of the contract caused the same to be recorded. Additional factual allegations concerning demand for performance, tender of the purchase price and payment of taxes were disputed.
On the basis of the foregoing facts, the lower court entered summary decree for the appellees, quieting title in them. The basis of this decision was, in the words of the able trial judge:
"[T]he contract executed by the parties hereto * * * constituted a cloud on the title of Plaintiffs. * * * The Court finds said contract to have been cancelled and repudiated by Plaintiffs prior to its receipt by Defendants * * * and that on this basis there was no legal contract binding on the parties * * *."
In appealing the summary decree the appellants argue that the lower court erred in determining the contract void and, *891 in any event, erred in entering summary decree when factual matters were disputed. The latter contention is without merit since it is obvious that such factual matters as were material to the lower court's decision were undisputed. While the existence of genuine issues of material fact precludes summary decree, the existence of dispute as to immaterial facts does not. Of course, as the lower court observed, if appellants' contention that the contract is valid were sustained, the factual matters which are disputed would be material. However, under appellees' view of the cause and the view adopted by the lower court, the disputed facts were immaterial and summary decree was proper.
Turning to the principal point raised in this appeal, we are confronted with a question apparently of first impression in this jurisdiction. The question is whether a contract is complete and binding when a letter of acceptance is mailed, thus barring repudiation prior to delivery to the offeror, or when the letter of acceptance is received, thus permitting repudiation prior to receipt. Appellants, of course, argue that posting the acceptance creates the contract; appellees contend that only receipt of the acceptance bars repudiation.
The appellants suggest that the law of Texas controls in determining this question, although they do not limit themselves to this argument. Close scrutiny of the record discloses that this interesting question of conflict of laws was not raised nor was the law of Texas relied upon below. Accordingly, the question cannot be raised on appeal. Kingston v. Quimby, Fla. 1955, 80 So.2d 455. See 2 Fla.Jur., Appeals § 290 (1963).
Treating the question as one arising under the laws of Florida and as a question of first impression in this jurisdiction, both parties have submitted briefs containing cogent argument and ample authority in support of their respective contentions. As the able trial judge observed, "the authorities cited and relied upon * * * appear to be in conflict."
The appellant, in arguing that the lower court erred in giving effect to the repudiation of the mailed acceptance, contends that this case is controlled by the general rule that insofar as the mail is an acceptable medium of communication, a contract is complete and binding upon posting of the letter of acceptance. See, e.g. 12 Am.Jur., Contracts § 46 (1938, Supp. 1963); 1 Williston, Contracts § 81 (3rd ed. 1957); 1 Corbin, Contracts § 78 (1950 Supp. 1961). Appellees, on the other hand, argue that the right to recall mail makes the Post Office Department the agent of the sender, and that such right coupled with communication of a renunciation prior to receipt of the acceptance voids the acceptance. In short, appellees argue that acceptance is complete only upon receipt of the mailed acceptance. They rely, inter alia, on Rhode Island Tool Company v. United States, 128 F. Supp. 417, 130 Ct.Cl. 698 (1955) and Dick v. United States, 82 F. Supp. 326, 113 Ct.Cl. 94 (1949).
Turning first to the general rule relied upon by appellant some insight may be gained by reference to the statement of the rule in leading encyclopedias and treatises. Accordingly, attention is directed to 12 Am.Jur., Contracts §§ 46, 49 (1938) for the following:
"§ 46. Acceptance by Mail.  The formation of the contract may be made dependent upon the communication of the acceptance to the offerer, and in such a case there will be no contract if for any reason the offerer is not notified of the acceptance according to the agreement. In cases in which such an arrangement has not been made, the courts have been confronted by the rather difficult question whether the contract is completed when the letter of acceptance is mailed or when it is received by the offerer. There is no doubt that the implication that a complete, final, and absolutely binding contract *892 is formed as soon as the acceptance of an offer is posted may in some cases lead to inconvenience and hardship. At the same time, it has been pointed out that an offerer, if he chooses, may always make the formation of the contract which he proposes dependent upon the actual communication to himself of the acceptance and that if no answer to his offer is received by him and the matter is of importance to him, he can make inquiries of the person to whom his offer was addressed. It has been suggested, moreover, that if the offerer is not to be bound by the acceptance until it is received by him, the party accepting the offer ought not to be bound when his acceptance is received, because he does not know of the meeting of the minds, for the offer may have been withdrawn before his acceptance was received. Upon balancing convenience and inconvenience, the courts have deemed it more consistent with the acts and declarations of the parties to consider the contract complete and absolutely binding on the transmission of the acceptance through the post, as the medium of communication which the parties themselves contemplate, instead of postponing its completion until the acceptance has been received by the offerer. By treating the post office as the agency of both parties, the courts have managed to harmonize the legal notion that it is necessary that the minds of the parties meet with the equally well-established principle that a determination to accept is ineffectual if it is not communicated either actually or by legal implication. Accordingly, if acceptance by mail is authorized, the contract is completed at the moment the acceptor deposits in the post office the letter of acceptance directed to the offerer's proper address and with the postage prepaid, provided he does so within the proper time and before receiving any intimation of the revocation of the offer. * * *
* * * * * *
"Of course, a letter which is written, but remains in the writer's hands or under his control, is not an acceptance. * * *
* * * * * *
"§ 49.  Effect of Withdrawal of, or Right to Withdraw, Letter from Mail.  Since 1887, at least, postal regulations have permitted the withdrawal, under certain conditions, of letters from the mail. * * *
"The authorities are not entirely harmonious as to the effect of such right to withdraw letters or of the withdrawal of letters pursuant to such regulations upon the acceptance of contracts. A leading authority on contracts states that it is not important that the acceptor has the power to withdraw his acceptance from the mail. Moreover, there are several decisions holding that an acceptance duly deposited in the mail is effective, although the acceptor intercepts the letter of acceptance and secures its return before it has reached the addressee. There are also numerous recent cases in which no question of withdrawal or the right to withdraw the acceptance from the mail arose, applying or recognizing the rule that a contract is complete at the time of the depositing of a proper letter of acceptance in the mail, where acceptance in this manner is authorized. On the other hand, the view is held that a contract is not deemed consummated by a deposit in the mail of a letter accepting an offer, so long as the sender has a right to withdraw the letter. The position has been taken that in view of the postal regulations permitting the withdrawal of a letter from the mail by the depositor, the post office should be regarded as the latter's agent, so long as the letter may be withdrawn by him, unless it appears, expressly or by implication, that the parties intended that the sender of the communication, *893 after mailing, should have no right to withdraw it."
A near identical statement of the general rule is found in 1 Williston, Contracts § 81 (3rd ed. 1957):
"Contracts are frequently made between parties at some distance and therefore it is of vital importance to determine at what moment the contract is complete. If the mailing of an acceptance completes the contract, what happens thereafter, whether the death of either party, the receipt of a revocation or rejection, or a telegraphic recalling of the acceptance, though occurring before the receipt of the acceptance, will be of no avail; whereas, if a contract is not completed until the acceptance has been received, in all the situations supposed no contract will arise.
"It was early decided that the contract was completed upon the mailing of the acceptance. The reason influencing the court was evidently that when the acceptance was mailed, there had been an overt manifestation of assent to the proposal. The court failed to consider that since the proposed contract was bilateral, as is almost invariably any contract made by mail, the so-called acceptance must also have become effective as a promise to the offeror in order to create a contract. The result thus early reached, however, has definitely established the law not only in England but also in the United States, Canada and other common law jurisdictions. It is, therefore, immaterial that the acceptance never reaches its destination."
The same work, in Section 86, negatives the possible effect of a power to recall an acceptance after mailing. In the author's words:
"By the United States Postal Regulations, the sender of a letter may regain it by complying with certain specified formalities, and yet a contract is completed by mailing an acceptance in the authorized channel. Since the acceptance is binding when it is mailed, the fact that the sender of a letter may regain possession of it should have no effect on the validity of the acceptance. * * *
"Title to chattels may also pass by an authorized appropriation on the part of the seller while they still remain entirely within his own control, and though it would not be generally admitted that there may be delivery of a formal document remaining wholly within the maker's hands, the mere possibility that the maker may regain possession would still permit a delivery to the post-office to operate as a delivery of the instrument to the person addressed.
"Though the analogy is by no means perfect between a transfer of property or of a formal instrument on mailing and the formation of a bilateral contract by the mailing of a letter of acceptance, no reason is apparent why the possibility of the withdrawal by the sender should be of any more importance in the latter case than in the former."
A second leading treatise on the law of contracts, Corbin, Contracts §§ 78 and 80 (1950 Supp. 1961), also devotes some discussion to the "rule" urged by appellants. Corbin writes:
"Where the parties are negotiating at a distance from each other, the most common method of making an offer is by sending it by mail; and more often than not the offeror has specified no particular mode of acceptance. In such a case, it is now the prevailing rule that the offeree has power to accept and close the contract by mailing a letter of acceptance, properly stamped and addressed, within a reasonable time. The contract is regarded as made at the *894 time and place that the letter of acceptance is put into the possession of the post office department."
Like the editor of Williston, Corbin negates the effect of the offeree's power to recall his letter:
"The postal regulations have for a long period made it possible for the sender of a letter to intercept it and prevent its delivery to the addressee. This has caused some doubt to be expressed as to whether an acceptance can ever be operative upon the mere mailing of the letter, since the delivery to the post office has not put it entirely beyond the sender's control.
"It is believed that no such doubt should exist. * * * In view of common practices, in view of the difficulties involved in the process of interception of a letter, and in view of the decisions and printed discussions dealing with acceptance by post, it is believed that the fact that a letter can be lawfully intercepted by the sender should not prevent the acceptance from being operative on mailing. If the offer was made under such circumstances that the offeror should know that the offeree might reasonably regard this as a proper method of closing the deal, and the offeree does so regard it, and makes use of it, the contract is consummated even though the letter of acceptance is intercepted and not delivered."
Significantly, Corbin expressly distinguishes cases involving bank drafts or bills of exchange from cases involving bilateral contracts. He writes:
"It should be borne in mind that whenever the receipt of the letter is necessary to produce some legal effect, the interception, and resulting nondelivery of the letter will prevent that effect. For almost all purposes, other than the acceptance of an offer, the mere mailing of a letter is not enough to attain the purpose. Unless it is clearly otherwise agreed, the mailing of a letter is not a sufficient notice to quit a tenancy, it is not actual payment of money that is inclosed, it does not transfer title to a check or other document; it will not ordinarily be sufficient notice required by a contract as a condition precedent to some contractual duty of immediate performance."
To a certain extent both appellants and appellees admit and approve the position adopted by the authorities quoted above. However, to the extent that these authorities would negative or disallow effect to appellees  offerees' power to repudiate their acceptance prior to its receipt by appellants, the appellees disagree. Their argument, and the position adopted by the lower court is succinctly expressed in the excellent memorandum opinion of the lower court as follows:
"* * * From our examination * * * the decisions of the Courts seem to hinge upon the question of whether or not the party has lost control of the instrument prior to the time of its renunciation by him. Formerly, the Courts took the position that once a letter had been deposited in the U.S. Mail, is was beyond retrieve and the depositor no longer had control over it; that the Post Office Department became, in fact, the agent of the addressee so that any attempt to cancel or repudiate the written document was beyond the power and authority of the sender and without effect once it had been deposited in the mail. U.S. Postal Regulations, Sec. 153.5, provide, and for some years has provided, that mail deposited in a post office may be recalled by the sender before delivery to the addressee.
"In the Court decisions cited by the parties here, wherever this Postal Regulation has been brought to the attention of the Court, they have held that the Post Office is the agent of the *895 sender, rather than the addressee, and his right to withdraw mail after deposit gives him the right to repudiate a document signed and mailed by him but not yet received by the addressee."
An examination of the cases relied upon by appellees sustains their contention that these decisions represent a departure from the general rule. In Traders National Bank v. First National Bank, 1920, 142 Tenn. 229, 217 S.W. 977, 9 A.L.R. 382, the Court held, when appellant bank, in response to receipt of a check drawn on it, mailed a draft to appellee bank but phoned and requested return of the draft prior to its receipt by appellee, that appellant had not accepted the check. This holding was predicated on the existence of a power in appellant to recall the draft from the mails. The Court concluded:
"In ordinary cases we will adhere to the old rule that the mailing of a letter amounts to a delivery of its contents to the person to whom it is addressed. This, however, is subject to the power of the person sending the letter to recover it from the mails, under the Postal Regulations of 1913. Such a delivery is therefore subject to be defeated by the proper exercise of such power."
In Guardian National Bank v. Huntington County State Bank, 1933, 206 Ind. 185, 187 N.E. 388, 92 A.L.R. 1056, the appellant bank sued to recover on checks drawn on appellee bank. The checks had been deposited in appellant bank and forwarded to a second bank, which bank notified appellee bank. Appellee prepared and mailed a letter indicating that it had credited the second bank with the amount of the checks. Later in the day, however, this letter was withdrawn from the mail and the credit changed to exclude the amount of the subject checks. The Court held that the original mailing had not constituted acceptance of the checks. Citing the Traders National Bank case, supra, and Ex parte Cote, L.R. 9 Ch. 27, (1873), the court determined that the Post Office was an agent of the sender and that until delivery to the addressee, mail remained in control of the sender. Discussing the rule that deposit in the mail constitutes acceptance, the Court said:
"It will be noted that in the rule as stated in the leading cases the element of surrendering control is always present. In some of the decisions which rely upon the leading cases that element is not included in the statement of the rule. It is often said that the rule depends upon the fiction that the post office is the agent of both parties. But agency is a question of fact, and the courts have ever been conscious of the difficulty of an agent serving two masters. It appears that in England, and in this country for a considerable time at least prior to 1913, communications deposited in the mail could not be recovered by the depositor, and by depositing in the mail the depositor parted with his dominion and control over the communication. The post office took control and possession for the addressee exclusively, and bound itself to hold possession and control for him and to deliver to him. The post office, therefore, became the agent of the addressee and of no one else, and, when it received the communication, it received it for the addressee and for no one else, and, when it took possession, it was for the addressee and for no one else, and for the purpose of delivery to the addressee and for no other purpose. It follows that the post office was not the agent of both parties. And thus the situation fits the rule, and, when a communication was delivered to the post office, the mailor, in fact, parted with his `dominion and control over it,' and the delivery was in fact, as well as in legal contemplation, complete.
"But in 1913 the Post Office Department adopted a regulation by the terms of which, under certain conditions, a *896 communication which has been mailed may be recovered as a matter of right and without the consent or authority of the addressee. Under this regulation, when a communication is mailed, it is as though it is intrusted to the sender's agent or servant for delivery, and is subject to recall at any time before actual delivery."
Referring to the Traders National Bank case, the Court said:
"If the post office is the agent of the sender in a case involving the mailing of a draft, because of the fact that the sender may recover the same, how can it be said that it is not the agent of the sender in the case of an acceptance of an offer which is subject to the same regulation? No rule of construction has been suggested that would permit of treating a messenger from whom a message may be recalled as the agent of any one but the sender.
"The time at which payment would become effective or a contract consummated by acceptance of an offer is controlled by contract, express or implied. The parties are bound to know the rules and regulations of the Post Office Department, and must be considered as acting in the light of those rules, and unless it appears by expression or implication that the parties intended that the acceptor or remittor should have no right to withdraw his communication after mailing, it must be assumed that they intended that he should continue to exercise control of it, and that therefore, following the normal rules of interpretation, the post office should be his agent.
"We conclude that the post office is the agent of the sender so long as the communication may be withdrawn by him, regardless of whether the transaction be treated as a payment or an acceptance of an offer to contract, and therefore the evidence supports the verdict of the jury."
A third case cited by appellee, Dick v. United States, 82 F. Supp. 362, 113 Ct.Cl. 94 (1949), involved mistaken acceptance of an offer evidenced by a government purchase order. The appellant, after mailing his acceptance wired a repudiation of the acceptance. The repudiation was received prior to the acceptance. Although remanding the cause for proofs, the court inferred that the fact of a mailed acceptance did not, as a matter of law, bar subsequent repudiation. In an opinion paralleling the opinion in the Guardian National Bank case, the court, over a vigorous dissent, concluded that the Post Office was the sender's agent and that "delivery" was incomplete so long as the acceptance had not been received.
The same court, in Rhode Island Tool Company v. United States, 128 F. Supp. 417, 130 Ct.Cl. 698 (1955), extended the principle that a contract was made only upon receipt of the acceptance to permit revocation of an offer after an acceptance had been posted but prior to its receipt. Again predicating its decision on the postal regulations, the court concluded:
"Does any one believe that if the mistake had been the other way, * * * that through oversight the defendant had mailed an acceptance for too high a price and the same day had wired withdrawing and cancelling the acceptance before it left the sending post office the defendant would nevertheless have been held to an excessive price? Or again, if after mailing such an acceptance the defendant, discovering its mistake, had gone to the sending post office and withdrawn the letter, the plaintiff on hearing of it, could have enforced an excessive contract on the ground that the acceptance actually had been posted and became final and enforceable, notwithstanding its withdrawal and nondelivery?
"We cannot conceive of such an unjust enforcement. No, under the new regulation, the Post Office Department becomes, in effect, the agency of the sender until actual delivery.

*897 "We are living in a time of change. The theories of yesterday, proved by practice today, give way to the improvements of tomorrow.
"To apply an outmoded formula is not only unjust, it runs counter to the whole stream of human experience. It is like insisting on an oxcart as the official means of transportation in the age of the automobile. The cart served a useful purpose in its day, but is now a museum piece.
"The old rule was established before Morse invented the telegraph as a means of communication. Commerce must have a breaking point upon which it may rely for the completion of a contract. At that time no faster mode of communication was known. But in the light of the faster means of communication the Post Office Department wisely changed the rule. The reason for the old rule had disappeared. This does not change any principle, it simply changes the practice to suit the changed conditions, but leaves unchanged the principle of finality, which is just as definite as ever, though transferred to a different point by the new regulation.
"This change seems to have been recognized by the Government officials who prepared the Invitation for Bids. The offer by the defendant stated that when the award was `received' by the bidder it would `thereupon' become a binding contract. This it would seem clinches the correctness of our interpretation."
It is clear then, as aforesaid, that these cases represent a departure from the general rule. It is equally clear that at least three of them might be distinguished. See 1 Corbin, Contracts § 80 n. 77 (1950 Supp. 1961). However, even if the cases are distinguishable as concerning payment rather than acceptance or as being unnecessarily broad in their pronouncements, their clear implication, be it by holding or dicta, deserves analysis and consideration.
As is abundantly clear from the quoted material excerpted from appellees' cases, cases, the decision in each is predicated on an assumption, correct or incorrect, that the basis of the rule they reject was invalidated by changed postal regulations. The opinions cited by appellees each proceed on the theory that the "deposited acceptance" rule was based on a theory that the depositor lost control of his acceptance when it was deposited and that this fact rendered the acceptance complete upon deposit. To the extent that "loss of control" was the significant element in the "deposited acceptance" rule, the logic of appellees' cases is impeccable. On the other hand, if the rule is, in fact, not based on the "loss of control" element, the fact that this element has been altered may in no way affect the validity of the rule. Determination of the question presented in this appeal cannot then be had merely by adoption or rejection of the logic of appellees' cases. Rather, the source and justification of the "deposited acceptance" rule must be found and appellees' argument considered in light of this finding. Should the proffered justification for the rule be other than the "loss of control" theory, adoption or rejection of the rule must be based on considerations other than those relied upon in appellees' cases.
As both of the treatises cited and quoted earlier point out, the courts have often been remiss in failing to distinguish between application of the "deposited acceptance" rule in cases involving offer and acceptance in contract law and its application in cases involving sales, negotiable instruments and notice. Yet the distinction is significant. Accordingly, in the attempt to find the basis of the rule, the cases discussed should be limited to contract cases with allusion to other applications of the rule only insofar as necessary to understanding of its application to contracts.
The rule that a contract is complete upon deposit of the acceptance in the mails, hereinbefore referred to as "deposited *898 acceptance rule" and also known as the "rule in Adams v. Lindsell," had its origin, insofar as the common law is concerned, in Adams v. Lindsell, 1 Barn. & Ald. 681, 106 Eng.Rep. 250 (K.B. 1818). In that case, the defendants had sent an offer to plaintiffs on September 2nd, indicating that they expected an answer "in course of post." The offer was misdirected and was not received and accepted until the 5th, the acceptance being mailed that day and received by defendant-offerors on the 9th. However, the defendants, who had expected to receive the acceptance on or before the 7th, sold the goods offered on the 8th of September. It was conceded that the delay had been occasioned by the fault of the defendants in initially misdirecting the offer.
Defendants contended that no contract had been made until receipt of the offer on the 9th.
"* * * They relied on Payne v. Cave, 3 T.R. 148, and more particularly on Cooke v. Oxley, [ibid., 653]. In that case Oxley, who had proposed to sell goods to Cooke, and given him a certain time at his request, to determine whether he would buy them or not, was held not liable to the performance of the contract, even though Cooke, within the specified time, had determined to buy them, and given Oxley notice to that effect. So here the defendants who have proposed by letter to sell this wool, are not to be held liable, even though it be now admitted that the answer did come back in due course of post. Till the plaintiffs' answer was actually received there could be no binding contract between the parties; and before then the defendants had retracted their offer by selling the wool to other persons.
"But the court said that if that were so, no contract could ever be completed by the post. For if the defendants were not bound by their offer when accepted by the plaintiffs till the answer was received, then the plaintiffs ought not to be bound till after they had received the notification that the defendants had received their answer and assented to it. And so it might go on ad infinitum. The defendants must be considered in law as making, during every instant of the time their letter was traveling, the same identical offer to the plaintiffs, and then the contract is completed by the acceptance of it by the latter. Then as to the delay in notifying the acceptance, that arises entirely from the mistake of the defendants, and it therefore must be taken as against them that the plaintiffs' answer was received in course of post."
Examination of the decision in Adams v. Lindsell reveals three distinct factors deserving consideration. The first and most significant is the court's obvious concern with the necessity of drawing a line, with establishing some point at which a contract is deemed complete and their equally obvious concern with the thought that if communication of each party's assent were necessary, the negotiations would be interminable. A second factor, again a practical one, was the court's apparent desire to limit but not overrule the decision in Cooke v. Oxley, 3 T.R. 653 [1790] that an offer was revocable at any time prior to acceptance. In application to contracts negotiated by mail, this latter rule would permit revocation even after unqualified assent unless the assent was deemed effective upon posting. Finally, having chosen a point at which negotiations would terminate and having effectively circumvented the inequities of Cooke v. Oxley, the court, apparently constrained to offer some theoretical justification for its decision, designated a mailed offer as "continuing" and found a meeting of the minds upon the instant of posting assent. Significantly, the factor of the offeree's loss of control of his acceptance is not mentioned.
The "meeting of the minds" justification advanced in Adams v. Lindsell is repeated in the first of two leading American cases *899 on point. In Mactier's Adm'rs v. Frith, New York, 1830, 6 Wendell 103, 21 Am. Dec. 262, the offeree died while an acceptance was in the post. Since, if a "meeting of the minds" was essential to the contract, the contract could have been completed only during the offeree's lifetime, the court found it necessary to determine the effective date of acceptance. They deemed the posting of the assent sufficient and wrote:
"All the authorities state a contract or an agreement (which is the same thing) to be aggregatio mentium. Why should not this meeting of the minds, which makes the contract, also indicate the moment when it becomes obligatory? I might rather ask, is it not and must it not be the moment when it does become obligatory? If the party making the offer is not bound until he knows of this meeting of minds, for the same reason the party accepting the offer ought not to be bound when his acceptance is received, because he does not know of the meeting of the minds, for the offer may have been withdrawn before his acceptance was received. If more than a concurrence of minds upon a distinct proposition is required to make an obligatory contract, the definition of what constitutes a contract is not correct. Instead of being the meeting of the minds of the contracting parties, it should be a knowledge of this meeting. It was said on the argument that if concurrence of minds alone would make a valid contract, one might be constructed out of mere volitions and uncommunicated wishes; I think such a result would not follow. The law does not regard bare volitions and pure mental abstractions. When it speaks of the operations of the mind, it means such as have been made manifest by overt acts; when it speaks of the meeting of minds, it refers to such a meeting as has been made known by proper acts, and when thus made known it is effective, although the parties who may claim the benefit of, or be bound by a contract thus made, may for a season remain ignorant of its being made."
However, the court went beyond this justification and proceeded to consider what facts constituted acceptance.
"What shall constitute an acceptance will depend, in a great measure, upon circumstances. The mere determination of the mind, unacted on, can never be an acceptance. Where the offer is by letter, the usual mode of acceptance is the sending of a letter announcing a consent to accept; where it is made by messenger, a determination to accept, returned through him, or sent by another, would seem to be all the law requires, if the contract may be consummated without writing. There are other modes which are equally conclusive upon the parties: keeping silence, under certain circumstances, is an assent to a proposition; anything that shall amount to a manifestation of a formed determination to accept, communicated or put in the proper way to be communicated to the party making the offer, would doubtless complete the contract; but a letter written would not be an acceptance so long as it remained in the possession or under the control of the writer. An acceptance is the distinct act of one party to the contract as much as the offer is of the other; the knowledge by the party making the offer, of the determination of the party receiving it, is not an ingredient of an acceptance. It is not compounded of an assent by one party to the terms offered, and a knowledge of that assent by the other." (Emphasis added.)
Thus, the element of loss of control was introduced, not as a primary legal requisite to the existence of a contract but as a factual matter affecting the sufficiency of the manifestation of assent. But see, Dunlop *900 v. Higgens, 1 H.L.C. 381 (1848). Significantly, in the second leading American case, Tayloe v. Merchants' Fire Insurance Co. of Baltimore, 9 How. [50 U.S.] 390, 13 L.Ed. 187 (1850) the Supreme Court did not advert to the "loss of control" but closely followed the reasoning of Adams v. Lindsell. Holding an insurance contract complete upon posting of an acceptance, the Court wrote:
"The negotiation being carried on through the mail, the offer and acceptance cannot occur at the same moment of time; nor, for the same reason, can the meeting of the minds of the parties on the subject be known by each at the moment of concurrence; the acceptance must succeed the offer after the lapse of some interval of time; and, if the process is to be carried further in order to complete the bargain, and notice of the acceptance must be received, the only effect is to reverse the position of the parties, changing the knowledge of the completion from the one party to the other.
"It is obviously impossible, therefore, under the circumstances stated, ever to perfect a contract by correspondence, if a knowledge of both parties at the moment they become bound is an essential element in making out the obligation. And as it must take effect, if effect is given at all to an endeavor to enter into a contract by correspondence, in the absence of the knowledge of one of the parties at the time of its consummation, it seems to us more consistent with the acts and declarations of the parties, to consider it complete on the transmission of the acceptance of the offer in the way they themselves contemplated; instead of postponing its completion till notice of such acceptance has been received and assented to by the company.
"For why make the offer, unless intended that an assent to its terms should bind them? And why require any further assent on their part, after an unconditional acceptance by the party to whom is is addressed?
"We have said that this view is in accordance with the usages and practices of these companies, as well as with the general principles of law governing contracts entered into by absent parties."
Whereas Mactier's Adm'rs v. Frith, supra, had made "loss of control" an operative fact, later courts tended to make this the operative fact of conclusive legal significance. Thus, in Dunlop v. Higgens, 1 H.L.C. 381 (1848) one Justice wrote:
"If a party does all that he can do, that is all that is called for. If there is a usage of trade to accept such an offer, and to return an answer to such an offer, and to forward it by means of the post, and if the party accepting the offer puts his letter into the post on the correct day, has he not done everything he was bound to do? How can he be responsible for that over which he has no control?"
The significance attached to "loss of control" in the Dunlop case must be considered a departure from the original reasoning of Adams v. Lindsell similarly so considered is the suggestion in another leading English case that the post is a common agent or agent of the offeror. This suggestion (and it can be considered nothing more) is found in Household Fire & Carriage Acc. Ins. Co. Ltd. v. Grant, 4 Exch. Div. 216 (Ct.App. 1879). In that case, one Justice, speaking for a majority, held a contract complete upon posting acceptance and justified this with the observation, inter alia, that:
"* * * It is impossible in transactions which pass between parties at a distance, and have to be carried on through the medium of correspondence, to adjust conflicting rights between innocent parties, so as to make the consequences of mistake on the part of a mutual agent fall equally upon the *901 shoulders of both. At the same time I am not prepared to admit that the implication in question will lead to any great or general inconvenience or hardship. An offerer, if he chooses, may always make the formation of the contract which he proposes dependent upon the actual communication to himself of the acceptance. If he trusts to the post he trusts to a means of communication which, as a rule, does not fail, and if no answer to his offer is received by him, and the matter is of importance to him, he can make inquiries of the person to whom his offer was addressed. * * *
"Upon balance of conveniences and inconveniences it seems to me, applying with slight alterations the language of the Supreme Court of the United States in Tayloe v. Merchants' Fire Insurance Co., 9 How. 390, 13 L.Ed. 187, more consistent with the acts and declarations of the parties in this case to consider the contract complete and absolutely binding on the transmission of the notice of allotment through the post, as the medium of communication that the parties themselves contemplated, instead of postponing its completion until the notice had been received by the defendant * * *." (Emphasis added.)
Examining the decisions in the Dunlop and Household Fire & Carriage Ins. Co. cases, it would seem clear that in attempting to provide additional justification for the "deposited acceptance" rule, the courts, in fact, served only to confuse and weaken the essential validity of the rule. Thus, the observation that the offeror having chosen to utilize the mails should bear the risk of delay occasioned thereby was extended by subsequent cases to a point wherein the validity of the contract was made to turn on a theory of communication to an agent. As Corbin points out, this fictitious agency theory cannot withstand criticism. See 1 Corbin, Contracts, § 78 (1950). However, the ease with which the agency theory is refuted does not necessarily impair the validity of the rule.
Similarly, the "loss of control" theory, having its origin in the observation that under general contract principles an acceptance is manifest only when the offeree loses the power to suppress the manifestation, has, by a process of extension, come to be urged as a factor of primary legal significance. Yet, as was discussed earlier, the "loss of control" was not deemed controlling in the earliest cases. Nor is the general principle that a manifestation of assent must be beyond the party's control to be effective any more sacred than the general rule that assent in contract must be communicated. Yet the latter is obviously qualified in the "deposited acceptance" rule and in many instances of unilateral contract. Why then should the "loss of control" principle not also be  or have been  qualified?
The unjustified significance placed on the "loss of control" in the cases relied upon by appellee follows from two errors. The first error is failure to distinguish between relinquishment of control as a factual element of manifest intent, which it is, and as the legal predicate for completion of contract, which it is not. The second error lies in confusing the "right" to recall mail with the "power" to recall mail. Under current postal regulations, the sender has the "power" to regain a letter, but this does not necessarily give him the "right" to repudiate acceptance. The existence of the latter right is a matter of contract law and is determinable by reference to factors which include, but are not limited to the existence of the power to recall mail. In short, the power to recall mail is a factor, among many others, which may be significant in determining when an acceptance is effective, but the right to effectively withdraw and repudiate an acceptance must be dependent upon the initial determination of when that acceptance is effective and irrevocable.
*902 From the foregoing it is clear that a change in postal regulations does not, ipso facto, alter or effect the validity of the rule in Adams v. Lindsell. To the extent that the cases relied upon by appellee mistakenly assumed that "loss of control" and "agency" were determinative of the validity of the rule they are not authority for rejecting the rule. Rather, the adoption of the rule in this jurisdiction must turn on an evaluation of its justifications, quite apart from the fallacious theories of agency and control sometimes advanced in its support.
Before discussing the justification of the "deposited acceptance" rule in contract law, it is important, to avoid confusion, to again distinguish between the rule in its application to offer and acceptance in contract and the application or nonapplication of an identical principle in other areas of the law. As the section from Corbin, quoted at pages 8 and 9 supra, indicates, the courts and authors properly distinguish clearly between these applications, although often, as in the cases relied upon by appellee, the distinction is overlooked. See Annot. 9 A.L.R. 386 (1920); 92 A.L.R. 1062 (1934).
When, as in those latter cases, a case like Ex parte Cote, L.R. 9 Ch. 27 (1873), which was concerned exclusively with negotiable instruments and delivery, is cited as controlling in cases involving contracts, both an insufficient analysis of contract law and a misapplication of otherwise valid principles result. It may well be that a transcendent uniformity with respect to the effect of mailing is desirable. See Bramwell, J., dissenting, in Household Fire & Carriage Acc. Ins. Co., Ltd. v. Grant, supra. But this extra-contract argument must abide disposition of the question as a matter of contract law. In any event, recognizing both the conceptual and practical distinctions between contract law and other areas, the argument for uniformity is scarcely persuasive. Disposition of the issue can and should be made within the context of traditional and current contract concepts.
An attempt at critical analysis of the "deposited acceptance" rule is by no means a new or unusual endeavor. The cases, treatises and learned journals are replete with discussion and analysis of the rule both in its practical and theoretical aspects. E.g., 1 Corbin, Contracts § 78 (1950); Ashley, Contracts Inter Absentes, 2 Col.L.Rev. 1 (1902); Winfield, Some Aspects of Offer and Acceptance, 55 L.Q.R. 499 (1939); Samek, A Reassessment of the Present Rule Relating to Postal Acceptance, 35 Aust.L.J. 38 (1961). Unfortunately, much of the adverse criticism is directed to justifications for the rule which are, in fact, not relied upon by its proponents. Accordingly, the brilliant refutations at the conceptual level of the argument from loss of control, the argument from agency and the related argument from waiver, do not meet the issue. Rather, discussion and criticism must be directed to the practical and theoretical basis of the rule relied upon by its advocates.
The justification for the "deposited acceptance" rule proceeds from the uncontested premise of Adams v. Lindsell that there must be, both in practical and conceptual terms, a point in time when a contract is complete. In the formation of contracts inter praesentes this point is readily reached upon expressions of assent instantaneously communicated. In the formation of contracts inter absentes by post, however, delay in communication prevents concurrent knowledge of assents and some point must be chosen as legally significant. The problem raised by the impossibility of concurrent knowledge of manifest assent is discussed and a justification for the traditional rule is offered in Corbin, Contracts § 78 (1950).
"A better explanation of the existing rule seems to be that in such cases the mailing of a letter has long been a customary and expected way of accepting the offer. It is ordinary business usage. More than this, however, is needed to explain why the letter is operative on mailing rather than on receipt by the *903 offeror. Even though it is business usage to send an offer by mail, it creates no power of acceptance until it is received. Indeed, most notices sent by mail are not operative unless actually received.
"The additional reasons for holding that a different rule applies to an acceptance and that it is operative on mailing may be suggested as follows: When an offer is by mail and the acceptance also is by mail, the contract must date either from the mailing of the acceptance or from its receipt. In either case, one of the parties will be bound by the contract without being actually aware of that fact. If we hold the offeror bound on the mailing of the acceptance, he may change his position in ignorance of the acceptance; even though he waits a reasonable time before acting, he may still remain unaware that he is bound by contract because the letter of acceptance is delayed, or is actually lost or destroyed, in the mails. Therefore this rule is going to cause loss and inconvenience to the offeror in some cases. But if we adopt the alternative rule that the letter of acceptance is not operative until receipt, it is the offeree who is subjected to the danger of loss and inconvenience. He can not know that his letter has been received and that he is bound by contract until a new communication is received by him. His letter of acceptance may never have been received and so no letter of notification is sent to him; or it may have been received, and the letter of notification may be delayed or entirely lost in the mails. One of the parties must carry the risk of loss and inconvenience. We need a definite and uniform rule as to this. We can choose either rule; but we must choose one. We can put the risk on either party; but we must not leave it in doubt. The party not carrying the risk can then act promptly and with confidence in reliance on the contract; the party carrying the risk can insure against it if he so desires. The business community could no doubt adjust itself to either rule; but the rule throwing the risk on the offeror has the merit of closing the deal more quickly and enabling performance more promptly. It must be remembered that in the vast majority of cases the acceptance is neither lost nor delayed; and promptness of action is of importance in all of them. Also it is the offeror who has invited the acceptance."
The justification suggested by Corbin has been criticized as being anachronistic. Briefly, critics argue that the evident concern with risk occasioned by delay is premised on a time lag between mailing and delivery of a letter of acceptance, which lag, in modern postal systems is negligible. Opponents of the rule urge that if time is significant to either party, modern means of communication permit either party to avoid such delay as the post might cause. See Samek, A Reassessment of the Present Rule Relating to Postal Acceptance, supra. Cf. Rhode Island Tool Co. v. United States, supra. At the same time critics of the rule cannot deny that even in our time delay or misdirection of a letter of acceptance is not beyond the realm of possibility.
Another justification offered for the rule, related to the argument of expediency discussed by Corbin, is the mixed practical and conceptual argument attributed to Holmes but in reality being manifest in Adams v. Lindsell itself. See Holmes, The Common Law, 305-307 (1881); Note, 38 Geo.L.J. 106, 110 (1949). This argument proposes that the making of an offer constitutes an expression of assent to the terms of the contract and that the "overt act" of depositing a written acceptance in the post represents the offeror's assent, whereupon the "concluding prerequisite" of a contract, mutual assent, is formed and the contract is complete. Critics of the rule respond by pointing out that the deposit of a letter in the mail is, in and of itself, a neutral factor, *904 charged with legal significance only because the rule makes this particular "overt act" significant: signing a contract but then pocketing it could be, they argue, viewed as equally conclusive.
At this point and upon the "overt act" theory issue is clearly joined. On the one hand proponents of the rule insist that contracts inter absentes are sui generis and require consideration not in terms of the secondary principles of contract law relating to the necessity of communicating assent and the necessity of an unrecoverable expression of acceptance, but in terms of the essential concept of manifest intent and assent. Opponents of the rule, though no longer encountering conceptual difficulty in the abandonment of the principle of communication, compare Langdell, Summary of Law of Contracts, 1-31 (2d ed. 1880) and Williston, Contracts § 81 (1957) with Samek, A Reassessment * * * supra, argue that absent overriding practical considerations the law relating to acceptance by mail should be harmonized with the law regarding offers by mail and contracts generally, i.e. that the acceptance is ineffective until received. Ultimately then the weight given the "practical considerations" and the emphasis accorded the reliance  expectation factors determine the view adopted as to the "deposited acceptance" rule.
In support of the rule proponents urge its sanction in tradition and practice. They argue that in the average case the offeree receives an offer and, depositing an acceptance in the post, begins and should be allowed to begin reliance on the contract. They point out that the offeror has, after all, communicated his assent to the terms by extending the offer and has himself chosen the medium of communication. Depreciating the alleged risk to the offeror, proponents argue that having made an offer by post the offeror is seldom injured by a slight delay in knowing it was accepted, whereas the offeree, under any other rule, would have to await both the transmission of the acceptance and notification of its receipt before being able to rely on the contract he unequivocally accepted. Finally, proponents point out that the offeror can always expressly condition the contract on his receipt of an acceptance and, should he fail to do so, the law should not afford him this advantage.
Opponents of the rule argue as forcefully that all of the disadvantages of delay or loss in communication which would potentially harm the offeree are equally harmful to the offeror. Why, they ask, should the offeror be bound by an acceptance of which he has no knowledge? Arguing specific cases, opponents of the rule point to the inequity of forbidding the offeror to withdraw his offer after the acceptance was posted but before he had any knowledge that the offer was accepted; they argue that to forbid the offeree to withdraw his acceptance, as in the instant case, scant hours after it was posted but days before the offeror knew of it, is unjust and indefensible. Too, the opponents argue, the offeree can always prevent the revocation of an offer by providing consideration, by buying an option.
In short, both advocates and critics muster persuasive argument. As Corbin indicated, there must be a choice made, and such choice may, by the nature of things, seem unjust in some cases. Weighing the arguments with reference not to specific cases but toward a rule of general application and recognizing the general and traditional acceptance of the rule as well as the modern changes in effective long-distance communication, it would seem that the balance tips, whether heavily or near imperceptively, to continued adherence to the "Rule in Adams v. Lindsell." This rule, although not entirely compatible with ordered, consistent and sometime artificial principles of contract advanced by some theorists, is, in our view, in accord with the practical considerations and essential concepts of contract law. See Llewellyn, Our Case Law of Contracts; Offer and Acceptance II, 48 Yale L.J. 779, 795 (1939). Outmoded precedents may, on occasion, be discarded and the *905 function of justice should not be the perpetuation of error, but, by the same token, traditional rules and concepts should not be abandoned save on compelling ground.
In choosing to align this jurisdiction with those adhering to the deposited acceptance rule, we adopt a view contrary to that of the very able judge below, contrary to the decisions of other respected courts and possibly contrary to the decision which might have been reached had this case been heard in a sister court in this State. However, we are constrained by factors hereinbefore discussed to hold that an acceptance is effective upon mailing and not upon receipt. Necessarily this decision is limited in any prospective application to circumstances involving the mails and does not purport to determine the rule possibly applicable to cases involving other modern methods of communication. Cf. Entores v. Miles Far East Corp., 2 Q.B. 327 (1955) (rejecting the application of Adams v. Lindsell to a case involving instantaneous communication). Restatement, Contracts § 65 (1932).
In the instant case, an unqualified offer was accepted and the acceptance made manifest. Later, the offerees sought to repudiate their initial assent. Had there been a delay in their determination to repudiate permitting the letter to be delivered to appellant, no question as to the invalidity of the repudiation would have been entertained. As it were, the repudiation antedated receipt of the letter. However, adopting the view that the acceptance was effective when the letter of acceptance was deposited in the mails, the repudiation was equally invalid and cannot alone, support the summary decree for appellees.
The summary decree is reversed and the cause remanded for further proceedings.
WHITE, J., and MOODY, JAMES S., Associate Judge, concur.