**BEST FOAM FABRICATORS, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 94–1036C.

United States Court of Federal Claims.

July 18, 1997.

William E. Hughes, III, Milwaukee, WI, for plaintiff.

Brian S. Smith, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Denise A. McLane, Department of the Navy, Aviation Supply Office, Philadelphia, PA, of counsel.

## OPINION

MEROW, Judge.

Following a trial in this action, plaintiff Best Foam Fabricators, Inc. ("Best Foam") seeks damages from defendant for breach of contract. Best Foam asserts that it entered into a valid and binding contract with the United States, Department of the Navy, Aviation Supply Office ("ASO"), for the production of foam fuel cells for use in Navy helicopters. Best Foam alleges further that the government breached the contract by withholding information Best Foam needed to complete performance and by refusing to recognize the existence of a valid contract. Best Foam seeks damages in the amount of the contract price plus the costs incurred pursuing this action.

Defendant contends that no contract was formed because Best Foam never accepted the government's offer to contract. Instead, defendant asserts, Best Foam's purported acceptance was really a counteroffer (which defendant eventually rejected) because it took exception to material terms of the proposed contract. Finally, defendant alleges that even if a valid contract was formed, Best Foam cannot recover because the foam fuel cells Best Foam manufactured pursuant to the contract do not conform to the contract specifications.

For the reasons stated below, it is held that a valid and binding contract was formed and that defendant's nonperformance and unjustified repudiation of the contract constitute a constructive termination of the contract for the government's convenience. Pursuant to the termination for convenience clause contained in the contract, plaintiff is entitled to recover $395,680.22, plus interest in accordance with the Contract Disputes Act, 41 U.S.C. § 611 (1994).

## FACTS

Best Foam is a small, minority-owned manufacturer of foam products located in Chicago, Illinois. Best Foam has manufactured foam products for the government since 1983 and has successfully completed several hundred government contracts. The company qualified as a "small and disadvantaged business" pursuant to section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), from 1985 to September 1994, when it graduated from the 8(a) program.

In 1989, Best Foam began manufacturing "foam fuel cells" for the government. These products are inserted into the fuel tanks of military aircraft to stabilize and contain the fuel so as to prevent or minimize the effects of an explosion if the aircraft crashes or is subjected to gunfire. In 1992, the United States Naval Aviation Depot ("NADEP") in Pensacola, Florida solicited bids for the production of a prototype set of foam fuel cells for the Navy's UH–1N/HH–1N helicopter. After competitive bidding, Best Foam was awarded the contract. The contract stated that the prototype set was to be manufactured in accordance with drawings created by another company, American Electronics Laboratories, Inc. ("AEL"). Best Foam produced a set of foam fuel cells using these drawings and submitted it to NADEP for testing. NADEP's engineers discovered that the cells contained certain dimensional and marking errors indicating that AEL's drawings were inaccurate. As a result, Best Foam, in conjunction with NADEP's engineers, developed its own set of drawings which corrected the errors in AEL's and successfully manufactured the prototype set using its drawings. NADEP subsequently

awarded Best Foam, on a sole source basis, a follow-up contract for the production of validation and verification sets of foam fuel cells for the UH–1N/HH–1N helicopter. Best Foam also manufactured these two sets using its drawings and successfully completed the contract.

The Navy then decided to procure foam fuel cells for its entire UH–1N/HH–1N fleet. There was an urgent need for the product because many of the helicopters were flying either with older, lower quality foam inserts which were deteriorating or without any foam inserts at all. In fact, many helicopters were grounded because they were not equipped with adequate foam inserts. The procurement was to be conducted by ASO in Philadelphia, Pennsylvania. NADEP's engineers recommended to ASO that the foam fuel cells be purchased from Best Foam in light of its successful completion of the prototype and validation/verification contracts. No other sources were recommended. Based on NADEP's advice, by letter dated May 19, 1993, ASO offered the requirement for the foam fuel cells to the Small Business Administration ("SBA") under the 8(a) program and identified Best Foam as the recommended source. By letter dated June 25, 1993, SBA accepted the offer and authorized ASO to negotiate a contract directly with Best Foam, subject to SBA's approval.

On July 6, 1993, ASO sent Best Foam a solicitation for 158 sets of foam fuel cells for the Navy's UH–1N/HH–1N helicopter fleet. The solicitation indicated that the contract would contain the standard inspection system requirements set forth in section 52.246–2 of the Federal Acquisition Regulation ("FAR"), "Inspection of Supplies–Fixed Price," 48 C.F.R. § 52.246–2 (1993), as well as the higher level inspection requirements contained in provision MIL–I–45208, "Inspection System Requirements."[1] This provision is much more stringent than FAR 52.246–2 and basically requires the contractor to have a detailed and thorough inspection system in place which ensures and substantiates that all goods submitted to the government con-

form to the contract requirements. The clause makes the contractor responsible for performing all of the inspections and tests necessary to ensure compliance with the contract. However, the government retains the right to determine the adequacy of the contractor's inspection procedures prior to and during performance pursuant to section 3.1, which states that the contractor's inspection system "shall be documented and shall be available for review by the Government Representative prior to the initiation of production and throughout the life of the contract."

Best Foam submitted its proposal in response to the solicitation on July 28, 1993. The proposal identified Best Foam's part numbers, corresponding to its drawings, as the items to be manufactured. Best Foam proposed a total price of $718,890. Nowhere in its proposal did Best Foam take issue with the proposed inclusion of MIL–I–45208 in the contract.

In August 1993, ASO and Best Foam engaged in price negotiations. The negotiations were conducted by ASO contracting officer William Ryan, Keith Hasty, president of Best Foam, and Darence Smith, Best Foam's government sales representative. Although the parties anticipated during the negotiations that production would be spread out evenly over a six month period following contract award, Mr. Ryan repeatedly stated that the Navy urgently needed the foam fuel cells for the reasons stated above. On September 14, 1993, the parties agreed upon a price of $569,795.40 and concluded negotiations. Mr. Smith certified that, as of that date, the cost and pricing data Best Foam submitted were accurate, complete, and current.

On September 17, 1993, Mr. Ryan contacted Keith Hasty and asked if, in light of the government's urgent need, Best Foam would agree to an accelerated delivery schedule whereby Best Foam would provide 75 sets of foam fuel cells within 60 days of contract award. Mr. Ryan also indicated that he would be forwarding a formal contract to Best Foam within the next few weeks. The

---

1. Although the solicitation and the contract both reference MIL–I–45208, the parties have included MIL–I–45208A, which apparently supersedes MIL–I–45208, as an exhibit. However, since the parties refer only to MIL–I–45208, the court will do the same.

next day, Keith Hasty decided to initiate production even though no formal contract had been executed. He testified that this decision was based on Mr. Ryan's representation that he would be sending a formal contract shortly, his repeated statements regarding the government's urgent need, and Mr. Hasty's belief that Best Foam would not be able to meet the proposed accelerated delivery schedule unless it delayed other projects and immediately began production. Transcript ("Tr.") at 963–68. He also testified that he decided to manufacture all 158 sets in one continuous production run in order to increase efficiency and avoid scheduling conflicts which might hinder production in the future. *Id.* Production began in late September and continued until early November 1993. By letter dated October 1, 1993, Best Foam formally agreed to the accelerated delivery schedule proposed by Mr. Ryan but did not inform him of its decision to initiate production.

On October 25, 1993, ASO contracting officer Anthony J. Santoro, Mr. Ryan's Supervisor, executed six copies of proposed contract no. N00383–94–C–001Q on behalf of the government and Mr. Ryan sent them to Best Foam via overnight mail. The proposed contract called for the manufacture of 158 sets of foam fuel cells for the Navy's UH–1N/HH–1N helicopter fleet at the agreed upon price of $569,795.40 and included the agreed upon accelerated delivery schedule. The proposed contract listed AEL's part numbers, which corresponded to AEL's drawings, as the items to be manufactured. Section E, "Inspection and Acceptance," incorporated MIL–I–45208 and stated that the Defense Contract Management Area of Operations ("DCMAO") in Chicago, Illinois was responsible for inspections and acceptance. Since the Quality Assurance Representative ("QAR") at DCMAO Chicago assigned to Best Foam was Steve Stone, he would be responsible under the contract for conducting inspections and determining Best Foam's

compliance with MIL–I–45208. Tr. at 136–37, 417, 1149, 1151. A cover letter enclosed with the proposed contracts stated that if Best Foam signed them without changing any of the terms and returned five copies to ASO, a contract would come into existence on the date of mailing. The cover letter also stated that if Best Foam found the proposed contract unacceptable, it should return all six copies unsigned with a statement of its exceptions attached.

On October 26, 1993, Best Foam received the proposed contracts and cover letter from ASO. Keith Hasty immediately signed all six copies on behalf of Best Foam without changing any of the terms and had them delivered to Sylvia Wilkerson, the SBA contracting officer assigned to Best Foam; as a section 8(a) procurement, the contract was a tripartite agreement requiring SBA's signature in addition to ASO's and Best Foam's. Ms. Wilkerson made some minor changes to certain SBA-related clauses and signed the contracts on November 2, 1993.[2] Best Foam retrieved them from SBA that same day.

Also on November 2, 1993, Darence Smith and Steve Hasty, Best Foam's vice president in charge of operations, called a meeting with Steve Stone to discuss the contract and to identify any difficulties which might arise during inspection. Mr. Stone reviewed a copy of the contract and noted that it did not contain national stock numbers ("NSNs") which Best Foam needed for identification purposes. He also noted that the contract did not contain shipping destinations which ASO was required to provide and Best Foam needed in order to apply for government bills of lading. In addition, he stated that he would need to see the drawings Best Foam used to manufacture the foam fuel cells in order to conduct an inspection. Finally, he noted that the contract contained MIL–I–45208 and stated that, since Best Foam had virtually completed production, it would

---

2. Ms. Wilkerson crossed out and wrote "delete" next to two inappropriate SBA-related clauses on several copies of the contract and inserted a separate page containing the appropriate clause. She testified that her changes were insignificant and had no substantive effect on the contract terms. Tr. at 245, 247–48, 262. Mr. Ryan

agreed. Tr. at 154. Nonetheless, in its pre-trial brief and to some extent at trial, defendant seemed to be relying on Ms. Wilkerson's corrections to support its position that no contract was formed. However, defendant abandoned this contention in its post-trial brief and the matter is therefore deemed waived.

"need clarification" from the contracting officer regarding the applicability of this provision. Tr. at 609. Mr. Stone, Mr. Smith, and Steve Hasty also apparently agreed that removal of MIL–I–45208 would be desirable because it placed too heavy a burden on Mr. Stone and would cause him to "over-inspect" the foam fuel cells which they all agreed was not necessary for this procurement and would interfere with and delay Best Foam's performance. Tr. at 609–11, 742–44, 942–46.

After the meeting, Mr. Smith prepared a letter to Mr. Ryan [3] dated November 2, 1993 which contained the heading, "Contract # N00383–94–C–001Q, Modification Requests." In the letter, Mr. Smith requested that MIL–I–45208 "be removed." He did not indicate why he wanted the provision removed but stated that Best Foam had "successfully produced four previous [sets of foam fuel cells] for NADEP Pensacola under our standard commercial quality and inspection systems. These [sets] were installed in UH–1N Aircraft with no complications and are performing as expected." He also requested that the government accept accelerated deliveries at no additional cost; that Best Foam's part numbers be referenced rather than AEL's; and that Mr. Ryan provide NSNs, shipping destinations, and other information Best Foam needed to complete performance. The letter did not indicate that Best Foam had begun or virtually completed production of the foam fuel cells.

Also on November 2, 1993, Best Foam forwarded a package containing five duly executed copies of the contract to ASO via overnight mail in accordance with ASO's instructions. ASO received the package on November 3, 1993 and Mr. Ryan opened it on November 5. The parties differ over whether the package contained Mr. Smith's November 2, 1993 letter. Despite the date of the letter, Mr. Smith testified that he probably completed it on November 3 and sent it to Mr. Ryan on that date. Tr. at 928–30. However, he was unsure how he sent it and Best Foam did not produce any evidence demonstrating how or when it was sent. *Id.*

Mr. Ryan testified that the letter was included in the package containing the signed contracts. Tr. at 75–76. The government also points out that the letter was not folded, indicating that it was not sent in a standard-size letter envelope but in a package similar in size to the one containing the contracts. Tr. at 85. Since the letter is actually dated November 2, 1993, and since Best Foam was unable to produce any physical evidence demonstrating that it was transmitted after that date or in a separate package, it is determined that the letter was sent to ASO in the same package containing the five signed contracts.

After reviewing the contents of the package, Mr. Ryan wrote "Signed K [contract] copies" on it and placed it in a contract file. On November 8, 1993, he sent a "Procurement Documental Referral" to ASO technical personnel inquiring whether ASO could grant the requests in Mr. Smith's November 2, 1993 letter. On November 9, 1993, he received a call from Mr. Smith regarding the status of Best Foam's requests, in particular its request for the deletion MIL–I–45208. During this conversation, Mr. Smith informed Mr. Ryan for the first time that the foam fuel cells had already been manufactured and were virtually ready for delivery. Mr. Smith stated that the manufacturing process was not complicated and that Mr. Stone could conduct a visual inspection to determine conformity with the contract specifications. Mr. Ryan responded that he would need to obtain DCMAO's agreement before waiving MIL–I–45208 and that he would request assistance from the QAR, Mr. Stone.

Mr. Ryan wanted to know when Best Foam initiated production. Mr. Smith mistakenly informed him that production began in August 1993 even though, as discussed above, it did not actually begin until late September, after the parties reached an agreement on price and concluded negotiations. Because Mr. Ryan was under the impression that Best Foam had begun production in August, however, he demanded to

---

3. The letter states that it was written pursuant to a November 2, 1993 telephone conversation between Mr. Smith and Mr. Ryan. However, nei-

ther individual testified that this conversation actually occurred.

know why he was not apprised of this during negotiations. He also questioned the validity of Best Foam's cost data which, he asserted, did not reflect that production had begun or that production would be completed in November 1993. Mr. Ryan stated that he wanted to see data demonstrating Best Foam's actual costs and informed Mr. Smith that he suspected Best Foam had engaged in defective pricing.

The parties differ over whether Mr. Ryan also stated during his November 9, 1993 conversation with Mr. Smith that he believed no contract existed because Best Foam's request for the deletion of MIL–I–45208 was a counteroffer. The issue is resolved by Mr. Ryan's own contemporaneous notes of the conversation. These notes make no mention of a counteroffer or Mr. Ryan's purported belief that no contract existed as a result of Best Foam's request for the deletion of MIL–I–45208. Rather, they show that his sole concern was the adequacy of the cost data Best Foam submitted during negotiations.

On November 10, 1993, John Hinton, ASO equipment specialist, and Diane Conroy, ASO weapons manager, responded to Mr. Ryan's November 8, 1993 Procurement Document Referral. Mr. Hinton indicated that Best Foam's part numbers were acceptable but determined that MIL–I–45208 could not be waived. Mr. Hinton testified that he based this determination on the fact that the data file for the contract indicated that MIL–I–45208 was required. Tr. at 1130–31. Ms. Conroy indicated that Best Foam's request for accelerated delivery, i.e., delivery of all 158 sets of foam fuel cells within 60 days of contract award, was acceptable. She also provided NSNs and shipping destinations which Best Foam needed to complete performance. However, Mr. Ryan did not provide this information to Best Foam as required by the contract.

By letter dated November 15, 1993, Mr. Smith again requested that MIL–I–45208 be waived. He acknowledged that MIL–I–45208 "requires certain systems and processes be written and available for review by a Government Representative prior to and during the production of the products." However-

er, he stated that, "[r]egrettably, we began and now have completed production of these products prior to formal award and distribution of this contract."

On December 10, 1993, Mr. Ryan sent a telefax to Mr. Stone asking whether MIL–I–45208 could be waived. Mr. Stone responded by facsimile dated January 4, 1994 in which he stated:

> [Best Foam's] standard inspection system is adequate for this procurement item.
>
> [Best Foam] maintains inspection records for receiving, in-process and final inspections.
>
> Fabriction [sic] process for this item are [sic] streight [sic] forward there are no hidden operations or in-process testing.
>
> All characteristics for visual and dimensional conformance may be witnessed at the final end item.
>
> [Best Foam] has successfully performed for NADEP Pensacola, for the same item . . .

Despite Mr. Stone's assurance that Best Foam's inspection system was adequate, Mr. Ryan did not act on Best Foam's request that MIL–I–45208 be deleted or otherwise proceed with contract performance. Instead, throughout November and December of 1993, he called Best Foam and continued to request additional cost data based on his suspicion that Best Foam had engaged in defective pricing. During these conversations, Mr. Ryan never mentioned his purported belief that Best Foam's request for the deletion of MIL–I–45208 was a counteroffer or otherwise precluded formation of a contract.

By letter dated January 4, 1994, Steve Hasty asked Mr. Ryan to clarify in writing his verbal requests for additional cost data and respond to Best Foam's November 2, 1993 letter so that Best Foam could complete contract performance. The letter also questioned Mr. Ryan's authority to demand additional cost data in light of the fact that the contract had already been awarded. Mr. Ryan responded by letter dated February 3, 1994, his first written correspondence to Best Foam since October 25, 1993, when ASO

forwarded the proposed contract to Best Foam. In the letter, he stated:

> The Naval Aviation Supply Office of Counsel has reviewed your 4 January 1994 letter and concurs with the contracting officer's decision to withhold award. Best Foam must comply with ASO's request to submit cost or pricing data that are accurate, complete and current as of the date price negotiations are concluded.

The letter did not even mention Best Foam's request for the deletion of MIL–I–45208 or suggest that this request played any role whatsoever in ASO's decision to "withhold award."

Steve Hasty responded by letter dated February 16, 1994. He stated that Best Foam believed a valid contract existed and that ASO was not entitled to additional cost data. He also wrote that ASO was unjustifiedly withholding the information Best Foam requested in its November 2, 1993 letter which Best Foam needed to complete performance. Finally, he stated that, although Best Foam was confident it had not engaged in defective pricing, it would provide additional cost data so long as it could reserve the right to file a claim if the government reduced the contract price.

Also during late 1993 and early 1994, Best Foam began selling some of the foam fuel cells manufactured pursuant to the disputed contract to the Defense General Supply Center in Richmond, Virginia ("DGSC"). For these purchases, DGSC agreed to waive MIL–I–45208 and referenced Best Foam's part numbers in the contracts instead of AEL's. Mr. Stone inspected the cells for DGSC and deemed them acceptable. There is no evidence that these cells were in any way defective. However, by facsimile dated July 12, 1994, Mr. Ryan asked DGSC to stop purchasing foam fuel cells from Best Foam until the issues between the parties were resolved. There is no market for the foam fuel cells other than the United States Navy or Marines.

During March, April and May of 1994, Best Foam submitted additional cost information to Mr. Ryan and the government attempted to negotiate a revised contract price. On May 9, 1994, when the parties were nearing an agreement, Keith Hasty transmitted a fax to Mr. Ryan containing language which Best Foam wanted to include in any price modification reserving its right to file a claim. By telefax dated May 10, 1994, Mr. Ryan offered Best Foam a revised price of $417,781 and stated that ASO's Office of Counsel was reviewing Best Foam's proposed language. However, in a two sentence fax dated May 12, 1994, Mr. Ryan withdrew ASO's offer without explanation. Mr. Ryan testified at trial that ASO withdrew the offer because he and ASO's attorney agreed that Best Foam's proposed language was "not acceptable." Tr. at 190. As a result, the parties proceeded toward litigation.

By letter dated May 26, 1994, Best Foam submitted to Mr. Ryan what it characterized as a "claim" based on ASO's refusal to recognize the existence of a valid contract. The "claim" did not seek the payment of money but a determination that a valid contract existed. On June 24, 1994, Mr. Ryan sent a letter to Best Foam which did not reference Best Foam's "claim" but did explain ASO's position regarding the contract. The letter stated that ASO considered Best Foam's November 2, 1993 request "for removal of the MIL–I–45208 requirement set forth in the solicitation to be an exception to a material term of the solicitation thereby preventing formation of a contract." The letter also asserted that Best Foam's decision to produce the foam fuel cells prior to contract award precluded compliance with MIL–I–45208 which entitled the government to perform "critical in process inspections." Mr. Ryan also restated his belief that Best Foam submitted incomplete cost data during negotiations, "thereby preventing formation of a contract on the basis that there was never any mutual assent." The letter concluded that, "[b]ased on Best Foam's exception to the MIL–I–45208 requirement and Best Foam's misrepresentation as to the time and associated costs of performance, the Contracting Officer reiterates his position that no contract was ever formed."

On June 29, 1994, Best Foam filed a "Complaint For Declaratory Relief" in this court seeking a declaration that a valid and en-

forceable contract existed; that the government cease and desist denying the validity of the contract; and that the government provide Best Foam with the information it requested in its November 2, 1993 letter so that Best Foam could complete performance. By Order dated July 28, 1994, the court dismissed the complaint for lack of subject matter jurisdiction. *Best Foam Fabricators, Inc. v. United States*, No. 94-420C (Fed.Cl. July 28, 1994).

In August of 1994, the government conducted a "pre-award survey" of Best Foam to determine if the company was still viable in the event that ASO changed its mind and decided to "award" Best Foam the disputed contract. Based on an inspection of Best Foam's facility, the survey found that Best Foam had written procedures in place which complied with MIL-I-45208 and had all the necessary inspection and testing equipment needed to satisfy the contract requirements. The survey concluded that Best Foam could successfully complete the contract and recommended award "based on submission of product that was manufactured previously." Nonetheless, ASO did not "award" the disputed contract to Best Foam.

Instead, in June 1995, ASO resolicited the government's requirement for the foam fuel cells on a competitive basis. The procurement was set aside for small businesses but was not restricted to 8(a) contractors. Based on a specific recommendation from Mr. Ryan, the solicitation included a requirement that the foam fuel cells be "newly manufactured." ASO received four offers ranging in price from $169,308.80 to $413,760.00. Best Foam submitted the third-lowest bid of $413,585.40. ASO awarded the contract to the low bidder at the price of $169,308.80.

By letter dated September 12, 1994, Best Foam submitted an "amended claim" to the contracting officer in accordance with the Contract Disputes Act, 41 U.S.C. §§ 601–613

(1994). The claim sought payment of the contract price in addition to a declaration that a valid contract existed. On November 8, 1994, the contracting officer issued a final decision finding that no contract was formed and denying Best Foam's claim in its entirety. Best Foam filed the instant action on November 29, 1994 seeking damages in the amount of $569,795.40 plus costs. A one-week trial was held in Chicago, Illinois. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(a)(1) (1994).[4]

## DISCUSSION

### A. Contract Formation

■ The primary issue in this case is whether a valid and binding contract was ever formed. "The requirements for a valid contact with the United states are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Management, Inc. v. United States*, 104 F.3d 1314, 1319 (Fed.Cir.1997). The parties agree that the proposed contract sent by ASO to Best Foam on October 25, 1993 was a valid offer signed by a government representative authorized to bind the United States in contract which provided for mutual consideration. However, the parties dispute whether Best Foam ever accepted the offer.

Plaintiff contends that it accepted the offer when, in compliance with ASO's instructions, it signed all six copies of the contract without changing any of the terms, obtained the signature of the appropriate SBA official, and returned five duly executed copies to ASO. Plaintiff alleges that its acceptance became effective either on November 2, 1993, when it sent the package containing the contracts to ASO, or on November 3, 1993, when ASO received the package. Defendant counters

---

**4.** *28 U.S.C. § 1491(a)(1)* provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." One of the central issues in this case is whether a valid contract was ever formed. However, jurisdiction is conferred so long as the complaint contains a well-pleaded allegation that an express or implied contract exists. *Gregory v. United States*, 37 Fed. Cl. 388, 391 (1997); *Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). There is no question that Best Foam pleaded the existence of a valid contract.

that Best Foam never accepted ASO's offer because Best Foam's November 2, 1993 letter accompanying the signed contracts took exception to the inclusion of a material term, MIL-I-45208, and therefore constituted a counteroffer. Defendant argues that ASO rejected this counteroffer by letter dated June 24, 1994.

It is well settled that "[a]n acceptance which requests a change or addition to the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms." Restatement (Second) of Contracts § 61 (1981); John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 170–71 (2d ed.1986). This rule has also been expressed as follows:

> Frequently an offeree, while making a positive acceptance of the offer, also makes a request or suggestion that some addition or modification be made. So long as it is clear that the offeree is positively and unequivocally accepting the offer, regardless of whether the request is granted or not, a contract is formed. Thus, *a request for a modification of the offer coupled with an otherwise unqualified acceptance, which does not depend on the offeror's assent to the requested change, operates as an acceptance, and a contract is thereby formed.*

2 Samuel Williston, *A Treatise on the Law of Contracts* § 6:16 (Lord ed., 4th ed.1991) (emphasis added) (footnotes omitted); 1 Arthur L. Corbin, *Corbin on Contracts* § 3.30 (Perillo ed.1993). Best Foam's November 2, 1993 letter accompanying its definitive acceptance, *i.e.*, its transmission of five duly executed, unchanged copies of the contract to ASO in compliance with ASO's instructions, unequivocally *requests* that the contract by modified to remove MIL-I-45208. The entire text of the letter relating to MIL-I-45208 states:

> [W]e are requesting the following;
>
> 1) that the M[I]L-I-45208 (E-511) requirement be removed. We have success-

fully produced four previous [sets of foam fuel cells] for NADEP Pensacola under our standard commercial quality and inspection systems. These [sets] were installed in UH-1N Aircraft with no complications and are performing as expected.

Neither this nor any other portion of the letter even remotely suggests that Best Foam's acceptance was dependent upon ASO's assent to the deletion of MIL-I-45208. Mr. Ryan, the recipient of the letter and the signed contracts, acknowledged this at trial. Tr. at 90, 195. Therefore, Best Foam's November 2, 1993 request for the deletion of MIL-I-45208 is simply not a counteroffer and does not invalidate Best Foam's acceptance.[5]

■ Defendant argues, however, that Best Foam's *subsequent* statements to Mr. Ryan indicated that Best Foam's acceptance was dependent on ASO's assent to the deletion of MIL-I-45208 and that, as a result, Best Foam's acceptance was really a counteroffer. Specifically, defendant asserts that Mr. Smith's statement to Mr. Ryan on November 9, 1993 that Best Foam had already manufactured the foam fuel cells and his November 15, 1993 letter to Mr. Ryan which acknowledged with regret that Best Foam had completed production and that MIL-I-45208 "requires certain systems and processes be written and available for review ... *prior to and during the production of the products*" (emphasis added) demonstrated that Best Foam could not comply with the contract unless the government agreed to delete MIL-I-45208. Thus, defendant concludes, "the contracting officer properly treated Best Foam's 'request' as a counteroffer." Defendant's Post-Trial Brief at 19. This line of reasoning must be rejected.

■ An acceptance is effective when it is communicated to the offeror. *Romala Corp. v. United States*, 20 Cl.Ct. 435, 443 (1990), *aff'd*, 927 F.2d 1219 (Fed.Cir.1991); *Gregory*, 37 Fed. Cl. at 392; *Slobojan v. United States*, 136 Ct.Cl. 620, 626, 1956 WL

---

5. Contrary to defendant's assertions, this is not a situation where a contractor has submitted a nonresponsive offer in a competitive procurement which the government is required to reject to preserve the integrity of the competitive system. Thus, the authorities cited by defendant are inapposite. *See Aluminum Co. of America*, B-

246003, 92–1 C.P.D. ¶ 184 (1992); *Hawkins & Powers Aviation, Inc.*, B-244360, 91–2 C.P.D. ¶ 313 (1991); *Martin Marietta Corp.*, B-233742.4, 90–1 C.P.D. ¶ 132 (1990); *Eclipse Systems, Inc.*, B-216002, 85–1 C.P.D. ¶ 267; *Honeywell, Inc. v. United States*, 16 Cl.Ct. 173, 180 (1989), *rev'd on other grounds*, 870 F.2d 644 (Fed.Cir.1989).

8362 (1956); *Rhode Island Tool Co. v. United States*, 130 Ct.Cl. 698, 128 F.Supp. 417, 419–21 (1955); *Dick v. United States*, 113 Ct.Cl. 94, 82 F.Supp. 326 .(1949); *cf.* Restatement (Second) of Contracts § 63(a) (discussing common law rule that acceptance is effective "as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror"). Best Foam's acceptance was communicated to ASO on November 3, 1993, when ASO received the package containing the five duly executed contracts. Thus, Best Foam's acceptance became effective on that date. Once it is effective, an acceptance cannot be revoked. *Romala*, 20 Cl.Ct. at 443; *Ryan v. United States*, 136 U.S. 68, 86, 10 S.Ct. 913, 919–20, 34 L.Ed. 447 (1890). Accordingly, Mr. Smith's statements to Mr. Ryan on November 9 and November 15, 1993 cannot retroactively transform Best Foam's valid acceptance into a counteroffer and unform the contract, even if they could be construed as indicating that Best Foam's ability to perform depended on the government's assent to the deletion of MIL–I–45208.

For these reasons, defendant's argument that Best Foam's request for the deletion of MIL–I–45208 was a counteroffer preventing formation of a contract lacks merit. Since Best Foam accepted the government's offer on November 3, 1993, a valid and binding contract was formed on that date.

**B. Constructive Termination for Convenience**

■ Following contract formation, the government failed to provide Best Foam with NSNs and shipping destinations as required by the terms of the contract. Likewise, the government failed to act on Best Foam's request that the government accept accelerated deliveries, that MIL–I–45208 be deleted, and that the contract be modified to reference Best Foam's part numbers rather than AEL's. Instead, the contracting officer unjustifiedly repudiated the government's contractual obligations by stating that ASO

would not acknowledge the existence of a contract until Best Foam submitted additional cost data [6] and by stating in his June 24, 1994 letter that no valid contract was formed because of Best Foam's request for the deletion of MIL–I–45208.

■ When one party to a contract fails to perform and improperly repudiates its contractual obligations, the other party is normally entitled to damages for breach. Restatement (Second) of Contracts § 243(2) ("a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach"); *see id.* § 253 (repudiation prior to non-performance constitutes anticipatory breach); *United States v. Dekonty Corp.*, 922 F.2d 826, 828 (Fed.Cir.1991) (same); *United States v. Purcell Envelope Co.*, 249 U.S. 313, 316–20, 39 S.Ct. 300, 300–02, 63 L.Ed. 620 (1919) (same). However, the contract at issue incorporated the clause set forth in FAR 52.249–2, "Termination for Convenience of the Government (Fixed Price)." This clause allows the government to terminate a contract in whole or in part if the contracting officer "determines that a termination is in the Government's interest." 48 C.F.R. § 52.249–2(a) (1993). The contracting officer's decision to invoke the clause is conclusive in the absence of bad faith or a clear abuse of discretion. *Krygoski Construction Co., Inc. v. United States*, 94 F.3d 1537, 1541 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997); *Kalvar Corp., Inc. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1304 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *John Reiner & Co. v. United States*, 163 Ct.Cl. 381, 325 F.2d 438, 442, (1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). In contrast to common law damages for breach of contract, the clause limits the contractor's recovery to costs incurred prior to the termination, a reasonable profit on the work performed, and certain additional costs associated with the termination. 48 C.F.R. § 52.249–2(e) & (f) (1993). Anticipatory

---

6. The contract did incorporate the clause set forth in FAR 52.215–22, "Price Reduction for Defective Cost or Pricing Data," which entitles the government to a price reduction if the contractor submits defective cost data during negotiations. 48 C.F.R. § 52.215–22 (1993).

However, nothing in this clause or applicable regulations authorizes the government to suspend performance or repudiate its contractual obligations based on its suspicion that the contractor engaged in defective pricing. *See* 48 C.F.R. § 15.804–7 (1993).

profits and consequential damages are not recoverable. 48 C.F.R. § 49.202(a) (1993).

■ Obviously, in this case, the contracting officer did not actually invoke the termination for convenience clause to end the contractual relationship between the parties. Nonetheless, the Supreme Court has held:

> A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.

*College Point Boat Corp. v. United States,* 267 U.S. 12, 15–16, 45 S.Ct. 199, 200–01, 69 L.Ed. 490 (1925) (footnotes omitted). Based on this principle, the rule has been established that if the contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach and limit liability. *John Reiner,* 325 F.2d at 443–44 (1963); *G.C. Casebolt Co. v. United States,* 190 Ct.Cl. 783, 421 F.2d 710, 712 (1970); *Maxima Corp. v. United States,* 847 F.2d 1549, 1553 (1988). This rule has been applied in similar cases to limit a contractor's recovery. For instance, the Court of Claims has constructively invoked the termination for convenience clause to limit a contractor's recovery after holding that the government was estopped from denying the existence of a valid contract, *e.g., Emeco Industries, Inc. v. United States,* 202 Ct.Cl. 1006, 485 F.2d 652, 659; *Manloading & Management Associates, Inc. v. United States,* 198 Ct.Cl. 628, 461 F.2d 1299, 1303 (1972), and after finding that the government improperly canceled a contract on the mistaken belief that contract award was invalid or illegal. *E.g., John Reiner,* 325 F.2d at

443; *Brown & Son Electric Co. v. United States,* 163 Ct.Cl. 465, 325 F.2d 446, 450 (1963); *Coastal Cargo Co., Inc. v. United States,* 173 Ct.Cl. 259, 351 F.2d 1004, 1007–08 (1965); *Albano Cleaners, Inc. v. United States,* 197 Ct.Cl. 450, 455 F.2d 556, 561–62 (1972); *Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356, 1361–62 (1978).

This is also an appropriate case for constructively invoking the termination for convenience clause to limit the government's damages. Since there has been no showing of bad faith or clear abuse of discretion, the contracting officer could have invoked the clause instead of improperly repudiating the contract. *Krygoski,* 94 F.3d at 1541.[7] Therefore, in accordance with the above authorities, the clause will be constructively invoked to retroactively justify the government's actions, avoid breach, and determine the government's liability to Best Foam.

## C. Quantum

■ A termination for convenience essentially converts a fixed price contract into a cost reimbursement contract. *Anlagen und Sanierungstechnik GmbH,* ASBCA No. 37878, 91–3 B.C.A. ¶ 24,128 at 120,753; *Seven Science Industries,* ASBCA No. 23337, 80–2 B.C.A. ¶ 14,518 at 71,555; *Caskel Forge, Inc.,* ASBCA No. 7638, 1962 B.C.A. ¶ 3318 at 17,108. As such, the contractor is entitled to recover all allowable costs incurred in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination. 48 C.F.R. § 52.249–2 (1993). Allowability is determined using the cost principles set forth in FAR part 31, subject to the general principle that the contractor should be compensated fairly for the work terminated. 48 C.F.R. §§ 49.113, 52.249–2(h), 49.201(a). FAR 31.201–2(a) provides that allowability is judged in light of the following factors: reasonableness; allocability to the contract; generally accepted accounting principles and practices; the terms of the contract; and any specific limitations set forth in

---

**7.** Plaintiff even acknowledges that the contracting officer could have terminated the contract for convenience. For instance, in its pre-trial submission, plaintiff stated that the "[t]he Contracting Officer could have decided to terminate the contract for convenience. However, that was not the course of action selected by the Contracting Officer." Plaintiff's Pre–Trial Brief at 4. Plaintiff also recognized in its post-trial reply brief that "termination for convenience cases are analogous to the instant case." Plaintiff's Post-Trial Reply Brief at 14.

FAR part 31. 48 C.F.R. § 31.201–2(a) (1993).

█ At trial, Best Foam presented evidence demonstrating that it incurred a total of $295,617.41, including profit, producing the foam fuel cells prior to the government's improper repudiation of the contract. In addition, Best Foam presented evidence that it incurred $76,591.81 storing the foam fuel cells during the government's attempt to renegotiate the contract price and that $27,313.00 should be charged to the contract for Best Foam's facilities capital cost of money. Both of these cost items are recoverable following a termination for convenience. *See* 48 C.F.R. §§ 52.249–2(f)(3)(iii) (storage costs), 31.205–10 (facilities capital cost of money). Thus, Best Foam asserts a total cost of $399,522.22 in connection with the contract consisting of the following:

| | |
|---|---|
| Direct Material: | $ 89,715.60 |
| Direct Labor: | $ 39,939.48 |
| Packaging Material: | $ 452.64 |
| Manufacturing Burden (2.499) | $99,808.76 |
| Cost of Goods: | $229,916.48 |
| General and Administration Expense (0.148): | $ 34,027.64 |
| Total Cost: | $263,944.12 |
| Profit (0.12) | $ 31,673.29 |
| Subtotal: | $295.617.41 |
| Storage Cost: | $ 76,591.81 |
| Facilities Capital Cost of Money: | $ 27,313.00 |
| Total: | $399.522.22 |

Defendant did not object to Best Foam's introduction of evidence supporting these figures. More importantly, defendant did not oppose Best Foam's post-trial proposed finding of fact asserting that it incurred the above costs, *see* Plaintiff's Proposed Findings of Fact ¶¶ 78, 80, notwithstanding the court's January 18, 1996 Order requiring defendant to include any opposition to plaintiff's proposed findings in its post-trial brief.[8] On the contrary, defendant acknowledged in its brief that "Best Foam incurred some $295,617.41 to produce" the foam fuel cells and stated that, if the government were found liable, "Best Foam's recovery should be $395,680.22," consisting of all of the costs outlined above reduced by $3,842, the proceeds from Best Foam's sale of some of the foam fuel cells to DGSC.[9] Defendant's Post–Trial Brief at 29. Accordingly, it is determined that Best Foam incurred $399,522.22 in connection with the contract as set forth above and that these costs are reasonable in amount, allocable to the contract, and otherwise allowable under the termination for convenience clause.[10]

█ Although defendant does not contest that Best Foam incurred $399,522.22 in connection with the contract, defendant, without citing any authority, argues that plaintiff is not entitled to recover any of its costs because the foam fuel cells do not conform to the contract requirements. Before addressing defendant's allegations of nonconformity,

---

**8.** Likewise, defendant did not include any of its own proposed findings controverting Best Foam's asserted costs of $399,522.22. Instead, defendant included the following proposed findings related to Best Foam's costs:

92. Best Foam did not incur $569,793.40 in costs to produce the fuel cell liners for the proposed contract.

93. Best Foam claims to have incurred cost in the amount of $399,522.22 in connection with the performance of the proposed contract.

(Citations to the record omitted).

**9.** The propriety of this reduction is discussed below.

**10.** The fact that Best Foam incurred most of its production costs prior to November 3, 1993, the effective date of the contract, is not a bar to recovery. FAR 31.205–32 states that precontract costs are allowable to the extent they 1) are incurred in order to meet the proposed delivery schedule; 2) are incurred directly pursuant to the negotiations and in anticipation of the award; and 3) would have been allowable if incurred during contract performance. 48 C.F.R. § 31–205–32 (1993); *Penberthy Electromelt International, Inc. v. United States,* 11 Cl.Ct. 307, 315 (1986); *Radant Technologies, Inc.,* ASBCA No. 38324, 91–3 B.C.A. ¶ 24,106 at 120,657; *AT & T Technologies, Inc.,* DOT BCA No.2006, 89–3 B.C.A. ¶ 22,104 at 111,151. As stated above, Keith Hasty testified that he decided to initiate production on September 18, 1993, after the parties reached agreement on price and concluded negotiations, after Mr. Ryan stated that he would soon be forwarding a formal contract to Best Foam, and based on his belief, which has not been shown to be unreasonable, that immediate production was necessary to comply with the accelerated delivery schedule Mr. Ryan proposed in light of the government's urgent need. Furthermore, as stated above, the costs would have

it must be determined whether a contractor is even precluded, as a matter of law, from recovering the costs of producing defective work following a termination for convenience. The boards of contract appeals have correctly noted that neither the termination for convenience clause nor the applicable regulations "provide any basis for disallowance of costs of producing nonspecification supplies incurred in the performance of the contract, if the costs meet the standard of reasonableness." *Caskel Forge,* 1962 B.C.A. at 17,108. As a result, the boards have consistently held that "where a contract is terminated for convenience of the Government, the contractor is entitled to recover its reasonable, allocable, and allowable costs incurred with respect to termination inventory even if such inventory did not comply in all respects with specification requirements." *New York Shipbuilding Co.,* ASBCA No. 15443, 73–1 B.C.A. ¶ 9852 at 46,018–19; *Caskel Forge,* 1962 B.C.A. at 17,108; *Best Lumber Sales,* ASBCA No. 16737, 72–2 B.C.A. ¶ 9661 at 45,098; *Riverport Industries, Inc.,* ASBCA No. 30888, 87–2 B.C.A. ¶ 19,876 at 100,521; *Youngstrand Surveying,* AGBCA No. 90–150–1, 92–2 B.C.A. ¶ 25,017 at 124,694. The boards have also noted that a contrary rule would, in effect, convert a convenience termination into a termination for default, even though a convenience termination is "not based upon any fault or negligence on the part of the contractor." *New York Shipbuilding,* 73–1 B.C.A. at 46,020.

The boards have imposed limits on the applicability of this rule. "To the extent the Government establishes that alleged deficiencies stemmed from gross disregard by [the contractor] of its contractual obligations, the costs of performing such grossly deficient work would be considered unreasonable and hence unallowable." *New York Shipbuild-* *ing,* 73–1 B.C.A. at 46,019; *Caskel Forge,* 1962 B.C.A. at 17,109 (contractor should be reimbursed unless defects resulted from its "fault or folly or careless conduct of the work or other disregard of its contractual duties"); *see also Morton–Thiokol, Inc.,* ASBCA No. 32629, 90–3 B.C.A. ¶ 23,207 at 116,471–72 (absent showing of gross misconduct, government must reimburse costs of producing defective work under cost reimbursement contract; proof that defects resulted from contractor's careless mistakes not sufficient to disallow costs); John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 1118 (3d ed. 1995) ("Allowable costs [following convenience termination] include those costs incurred in producing defective material ... as long as the amount of defective material is not unreasonable").

Apparently, this rule has never explicitly been endorsed by the Federal Circuit or its predecessor,[11] nor has it previously been applied in this court. However, the rationale provided by the boards for its application is persuasive and there is no reason to depart from the rule in the circumstances of this case. In particular, since the termination for convenience clause and the applicable regulations do not require the contractor to prove that the terminated work strictly complies with the contract specifications, it would be particularly inappropriate to impose this requirement in circumstances such as these, where the government actually breached the contract and the termination for convenience clause is constructively invoked to limit liability. This determination is consistent with the principle established in *Acme Process Equipment Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). There, the Court of

---

been allowable if incurred during contract performance. Accordingly, Best Foam's precontract costs are allowable. *See Penberthy,* 11 Cl. Ct. at 315–16.

**11.** In *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759 (Fed.Cir.1987), the government asserted that the contractor's recovery following an improper default termination which was converted into a termination for convenience should be reduced by the amount the government purportedly spent correcting the contractor's deficient work. The contractor urged the court to rule that the government was not entitled to an offset for the costs of corrective work following a convenience termination, a principle which is obviously related to the rule that a contractor may recover the costs of nonconforming work. The court declined to rule on that ground, however, holding instead that the government failed to meet its burden of proving the amounts allegedly spent for the corrective work. 828 F.2d at 769.

Claims held that, upon an improper cancellation of a contract, the contractor is entitled to recover, under a restitution theory, the reasonable value of its performance unless the *government* proved that "the costs incurred by the contractor were excessive (as a result, for example, of inefficiency or extravagance)." *Id.* 347 F.2d at 530. For these reasons, it is determined that Best Foam is entitled to recover the costs of producing the foam fuel cells, even if some were shown not to be in strict compliance with all of the contract specifications, unless the government established that any defects resulted from Best Foam's gross disregard of its contractual obligations or that any defects are so extensive as to render Best Foam's costs unreasonable.

 Defendant's main contention regarding the purported nonconformity of the foam fuel cells is that Best Foam failed to comply with contract provision MIL–I–45208. As stated above, this provision requires the contractor to have an inspection system in place which ensures and substantiates that all goods submitted to the government conform with the contract requirements. While the clause puts the responsibility for conducting the inspections necessary to ensure conformity with the contract on the contractor, the government reserves the right to review the contractor's inspection procedures prior to and during performance. Section 3.1 provides that the contractor's inspection system must "be documented and shall be available for review by the Government Representative *prior to the initiation of production and throughout the life of the contract.*" Section 3.1 (emphasis added). Defendant alleges that it lost its right under MIL–I–45208 to review Best Foam's inspection system prior to and during the manufacturing process as a result of Best Foam's pre-award production of the foam fuel cells.[12] Defendant argues that Darence Smith recognized in his November 15, 1993 letter to the contracting

officer that Best Foam's early production precluded the government from exercising its rights under MIL–I–45208 which is why he requested that the provision be deleted. Thus, defendant concludes, Best Foam's conduct in manufacturing the foam fuel cells prior to award was not in compliance with MIL–I–45208 and Best Foam should not recover its costs.

Although defendant may have lost its right to conduct inspections and to review Best Foam's inspection procedures prior to and during production, it does not follow that those procedures failed to comply with MIL–I–45208. On the contrary, all of the evidence, including the testimony of the government's own representatives, demonstrates that Best Foam's inspection procedures satisfied the requirements of MIL–I–45208. Mr. Stone, the QAR who was responsible under the contract for determining Best Foam's compliance with MIL–I–45208, stated that he reviewed Best Foam's inspections procedures for the production of foam fuel cells on several occasions and determined that they complied with MIL–I–45208. Based on his experience, which included visiting Best Foam's facility at least once a month since 1988, when he was first assigned to Best Foam, he concluded that Best Foam had inspection procedures in place which met the requirements of MIL–I–45208 when it manufactured the foam fuel cells at issue. Tr. at 576–78, 589, 592, 627–27, 665. His testimony is confirmed by his January 4, 1994 facsimile to the contracting officer in which he stated that Best Foam's inspection system was "adequate for this contract." Tr. at 612–15. Mr. Hinton, ASO's equipment specialist, agreed with Mr. Stone and testified that the adequacy of Best Foam's inspection system "wasn't a dispute." Tr. at 1163, 1172. Finally, the government's August 1, 1994 "pre-award survey" found that Best Foam had "all the necessary inspection and test equipment that

---

12. Defendant also alleges that it lost similar inspection rights under FAR 52.246–2 which requires the contractor to make its inspection records "available to the government *during contract performance* and for as long afterwards as the contract requires" and confers upon the government "the right to inspect and test all supplies called for by the contract, to the extent practicable, at all places and times, *including the period of manufacture,* and in any event before acceptance." 48 C.F.R. § 52.246–2(b) & (c) (1993) (emphasis added). Since these rights do not materially differ from those provided by MIL–I–45208 and do not materially alter the analysis, they will not be separately addressed.

will be required to satisfy the solicitation requirements" and had "written procedures in place to satisfy MIL–I–45208 inspection requirements." Thus, the evidence demonstrates that Best Foam's inspection procedures complied with MIL–I–45208.

Furthermore, Mr. Stone testified that he needed to conduct inspections during the production process pursuant to MIL–I–45208 only if the contractor was new, had a history of quality problems, or if its inspection procedures had not previously been examined. Tr. at 596–99. Mr. Stone acknowledged that, as of November 1993, Best Foam was not a new manufacturer of foam fuel cells, the quality history of its product had always been good, and he had already examined Best Foam's inspection system and determined that it complied with MIL–I–45208. As a result, he concluded that he did not need to review Best Foam's inspection procedures during the production of the foam fuel cells at issue. *Id.*

Accordingly, the government's loss of its right under MIL–I–45208 (which it apparently would not have exercised) to inspect and review Best Foam's inspection system (which it acknowledges complied with MIL–I–45208) does not imply that Best Foam grossly disregarded the contract requirements or that its work was deficient and provides no basis for disallowing any of Best Foam's costs.

■ Defendant's next argument is that the foam fuel cells are defective because Best Foam produced them in accordance with its drawings, not the AEL drawings referenced in the contract. Mr. Hinton, who was not responsible for inspecting or determining the acceptability of the foam fuel cells under the contract and had no previous experience with foam fuel cells, testified that these two sets of drawings contained different dimensional requirements and, as a result, the foam fuel cells manufactured by Best Foam are nonconforming. Tr. at 1088–1115.

Best Foam acknowledged that its drawings and AEL's are dimensionally different but attributed the differences to the mistakes in the AEL drawings discovered by NADEP during performance of the prototype contract. As stated above, pursuant to that contract, Best Foam manufactured a set of foam fuel cells for the UH–1N/HH–1N helicopter using AEL's drawings. NADEP's engineers discovered that the cells contained certain dimensional and marking errors, indicating that AEL's drawings were inaccurate. Best Foam then developed its own drawings which corrected the errors and manufactured another set of cells which NADEP accepted. Likewise, pursuant to the follow-up validation/verification contract, Best Foam manufactured two additional sets of cells using its drawings which NADEP also accepted. Based on its approval of the cells Best Foam manufactured pursuant to the prototype and validation/verification contracts using its drawings, NADEP recommended that ASO procure foam fuel cells for the Navy's entire UH–1N/HH–1N fleet from Best Foam.

Thus, when Best Foam manufactured the foam fuel cells at issue, it was aware that use of the AEL drawings would yield a product with dimensional and marking errors while use of its own drawings would yield a product which had been accepted and approved by NADEP engineers assigned to the UH–1N/HH–1N helicopter. In these circumstances, Best Foam's decision to manufacture the cells using its drawings even though AEL's were referenced in the contract was not a gross disregard of its contractual obligations and provides no basis for disallowing any of Best Foam's costs.

■ Next, defendant asserts that Best Foam failed to comply with fabrication specification 89–MMCRB–050 referenced in the AEL drawings. Defendant argues that section 5.4.3.8 of this provision required Best Foam to wrap the foam fuel cells in "black polyethylene film, tape sealed and properly identified" while Best Foam packaged the products in clear polyethylene which was heat sealed. Defendant expressed concern that the foam fuel cells could be damaged as a result of Best Foam's allegedly improper packaging.

However, Best Foam's packaging method reasonably complied with instructions ASO specifically wrote into the contract which differed from the requirements of 89–MMCRB–050. In section D of the contract, "Preservation, Packaging, Packing and Marking Re-

quirements," ASO inserted certain codes which, according to the unrefuted testimony of Steve Hasty, indicated that there were no specific packaging requirements and that Best foam needed only to package the products in accordance with good commercial practices. Tr. at 767–70. Based on this information, Best Foam used the same packaging method it had always used (which the government never previously found objectionable) and wrapped the foam fuel cells in clear polyethylene which was heat sealed. *Id.* Since this method complied with the information ASO specifically wrote into the contract and had never previously been questioned by the government, it was not a gross disregard of Best Foam's contractual obligations and provides no basis for disallowing any of Best Foam's costs.

Furthermore, there is no evidence that Best Foam's use of heat sealing and clear polyethylene damaged the foam fuel cells. With regard to heat sealing, Mr. Hinton was concerned that the foam "could have gotten hot and maybe collapsed the pores of the foam or whatever." Tr. at 1105–06. However, although some of the foam fuel cells were present during the trial, neither Mr. Hinton nor anyone else on behalf of the government presented any evidence that this type of damage had actually occurred. In addition, it is doubtful that Mr. Hinton's fears are legitimate in light of the fact that the 1995 reprocurement contract specifically allowed heat sealing. Tr. at 1225–27.

With regard to Best Foam's use of clear rather than black polyethylene, Mr. Hinton was concerned that the cells would be exposed to ultraviolet rays which might cause deterioration. Tr. at 1089, 1103. Again, no evidence was presented that such deterioration had in fact occurred. Furthermore, Best Foam packaged the cells in boxes in addition to wrapping them in polyethylene, so they would not have been exposed to ultraviolet light during storage and delivery. In addition, Mr. Ryan testified that the cells would be promptly installed after the government received them. Tr. at 1210. Thus, the cells would not be subjected to ultraviolet light for any significant period of time. Since section 5.3.3 of provision 89–MMCRB–

050 states that harmful deterioration will not occur during short periods of exposure such as the time required for component fabrication, there is no basis for concluding that the cells did or would have deteriorated as a result of Best Foam's use of clear polyethylene. In short, there is no evidence that the cells are or would have become defective prior to installation as a result of Best Foam's packaging method. Consequently, Best Foam's packaging method provides no basis for disallowing any of Best Foam's costs.

Defendant also argues that Best Foam used hot wire cutting tools to cut the foam in violation of section 5.4.3 of 89–MMCRB–050 which provides that "[t]he cutting will be by mechanical blade." In support, defendant relies on a March 11, 1994 letter from Best Foam to the contracting officer stating that Best Foam incurred labor costs designing and building "hot wire cutting tools." However, this letter does not indicate that hot wire cutting tools were used to cut the foam. Keith Hasty's unrefuted testimony established that Best Foam used these tools to cut templates used for contour cutting, not to cut the foam. Tr. at 993. Mr. Stone also testified that he had witnessed Best Foam's procedures for manufacturing foam fuel cells and observed that Best Foam uses a mechanical blade to cut the foam. Tr. at 669–70. Likewise, the March 11, 1994 letter relied on by the government indicates that Best Foam incurred significant labor costs performing "band saw cutting," which is allowed by 89–MMCRB–050. Thus, defendant's contention lacks merit.

Next, defendant argues that the foam buns Best Foam used to manufacture the foam fuel cells were not in compliance with contract specification MIL–F–87260. Best Foam obtained these buns from its supplier, Crest Foam Industries, Inc. ("Crest"), whom the government deemed an approved source. Nonetheless, the government argues that Crest's certifications do not indicate that tests for tear resistance and flammability required by MIL–F–87260 were performed on the production runs from which the buns shipped to Best Foam originated. As a result, defendant speculates, the buns may

have been defective. These conjectures are unfounded, however, because section 4.5.3 of MIL–F–87260 requires that tests for flammability and tear resistance be performed only on an annual basis, not on every production run. When the issue arose at trial, Best Foam obtained Crest's annual test report from November 1993 which indicated that Crest's foam buns passed the tests for flammability and tear resistance.

Defendant also speculates that the foam fuel cells "may have been made out of improperly aged material," Defendant's Post–Trial Brief at 25, in violation of section 3.3 of MIL–F–87260 which states that "the maximum time of delivery from the manufacturer shall not exceed one year." However, Crest's certifications indicate that the foam buns provided to Best Foam were manufactured on February 11, 1993 and September 15, 1993. Since Best Foam obtained the foam buns at some point before late September 1993, when it began producing the foam fuel cells, the foam buns were not improperly aged.

Finally, defendant attempts to argue that Best Foam violated section 3.3.1 of MIL–F–87260 by failing to maintain the foam buns obtained from Crest in their original bags prior to manufacturing the foam fuel cells. This argument must be rejected for two reasons. First, the language on which defendant relies is not a contractual requirement but a statement regarding the shelf life of the foam buns. Section 3.3.1 states that "[t]he storage life of the material covered by this specification is not limited, provided it is maintained in its original sealed polyethylene bag plus opaque overwrap at temperatures below 90 [degrees Fahrenheit]." Accordingly, even if Best Foam did decide to put the foam buns obtained from Crest in different bags prior to manufacture, it would not follow that Best Foam violated the contract. Second, the evidence does not support defendant's claim that Best Foam put the foam buns in different bags. While Mr. Hinton, who had never seen the original foam buns provided by Crest, testified without explanation that Best Foam did not maintain them in their original bags, Tr. at 1089, Steve Hasty testified that Best Foam did in fact leave the foam buns in their original bags until the time of manufacture. Tr. at 797. He also added that Best Foam had no reason to switch bags. *Id.* Given that Mr. Hasty had direct knowledge of the facts, Mr. Hinton's testimony is discounted. Defendant's argument that Best Foam "violated" the "requirement" that the foam buns from Crest be stored in their original bags is unfounded.

In short, defendant has not shown that Best Foam grossly disregarded the contract requirements or that the foam fuel cells are unreasonably defective. As demonstrated above, most of defendant's allegations of nonconformity are unfounded and none provides any basis for disallowing Best Foam's costs.

The government's final contention is that Best Foam's recovery should be reduced by $3,842, the amount Best Foam received from sales of the foam fuel cells to DGSC before Mr. Ryan asked DGSC to stop purchasing them from Best Foam. In this regard, defendant is correct. The termination for convenience clause states that the proceeds from the disposition of termination inventory shall be applied to reduce the contractor's recovery. 48 C.F.R. §§ 52.249–2(b)(6) & (b)(9) (1993). Accordingly, Best Foam's recovery must be reduced from $399,522.22 to $395,-680.22.

## CONCLUSION

Based on the foregoing, it is concluded that a valid and binding contract was formed between Best Foam and the government on November 3, 1993; that the government's nonperformance and refusal to recognize the existence of a valid contract constitute a constructive termination of the contract for the government's convenience; and that, pursuant to the termination for convenience clause contained in the contract, Best Foam is entitled to recover $395,680.22.

Accordingly, it is ORDERED that Final Judgment be entered in this matter in favor of plaintiff, Best Foam Fabricators, Inc., in the amount of $395,680.22, plus interest computed in accordance with the Contract Dis-

putes Act, 41 U.S.C. § 611 (1994), on the basis of plaintiff's September 12, 1994 claim.

Each party must bear its own costs.